Linnie Kay BERRY, individually and as natural mother and next friend of her three minor children whose natural father was Mark A. Berry, deceased; and as Personal Representative of the Estate of Mark A. Berry, deceased, Plaintiff–Appellee,

v.

CITY OF MUSKOGEE, OKLAHOMA, a Municipal Corporation, Defendant–Appellant.

Nos. 86–1934, 86–2003.

United States Court of Appeals, Tenth Circuit.

April 10, 1990.

---

1490

Jim T. Priest of McKinney, Stringer & Webster, Oklahoma City, Okl., for defendant-appellant.

Wayne Wells, Edmond, Okl., for plaintiff-appellee.

Before McKAY, LOGAN and TACHA, Circuit Judges.

LOGAN, Circuit Judge.

Defendant City of Muskogee (the City) appeals from a jury verdict in favor of plaintiff Linnie Kay Berry (Berry) in this 42 U.S.C. § 1983 suit. The City alleges that the district court erred by (1) not submitting the case to the jury under an Eighth Amendment standard, (2) denying the City's motions for a directed verdict and judgment notwithstanding the verdict for insufficiency of the evidence, (3) improperly instructing the jury on the measure of damages, and (4) granting plaintiff's attorney $31,000 in fees under 42 U.S.C. § 1988.

Berry brought this suit on behalf of herself and her children and as the personal representative of the estate of Mark Berry, her deceased husband and father of the children. Mark Berry was murdered by fellow prisoners at the Muskogee City–Federal Jail, while in the custody and control of the City. In statements given to federal authorities, Mark Berry had previously identified two of the murderers as his cohorts in crime. Berry asserted that the City had deprived her husband of his right to be free from cruel and unusual punishment under the Eighth Amendment and deprived him of life without due process of law in violation of the Fourteenth Amendment.[1] Her complaint alleged that these violations were caused by the City's deliberate indifference to her husband's safety. She sought damages for her husband's pain and suffering and expected loss of earnings, her grief and loss of consortium, and her children's grief and loss of companionship. The case was submitted to the jury under the Due Process Clause of the Fourteenth Amendment. The jury returned a verdict in favor of Berry and awarded $100,000 in damages. We vacate the judgment and remand for a new trial.

# I

## A

The district court submitted the case to the jury under a due process instruction as follows:

"A governing body may be sued for monetary relief under the law previously given to you.

However, before a governing body may be held liable under that law, you must find from the evidence:

One: That the governing body implemented or executed or acquiested [sic] in a policy statement, ordinance, regulation, or decision officially adopted or made by those whose acts may fairly be said to represent official policy, including governmental customs, even though such customs have not received formal governmental approval.

And two: That the governing body implemented or executed or acquiested [sic] in such policy, ordinance, regulation, decision or 'custom' with the intention to deprive another of their constitutional rights, or they knew, or should have known that such action would violate or deprive another of their constitutional rights.

The defendant City of Muskogee has a constitutional obligation or duty to have policies and procedures which will not deprive a person of their life while an inmate of defendant's jail.

If you find that the policies and procedures of the defendant caused the plaintiff's decedent's death, then you shall find that the defendant City of Muskogee deprived plaintiff's decedent of a constitutional right under the Fifth and Fourteenth Amendments to the Constitution of the United States."[2]

II R. 7–8.

Berry argues that, because her husband was awaiting sentencing at the time of his death, he should be treated as a pretrial detainee whose rights are governed by the Due Process Clause and, thus, this instruction was proper. The City contends that the district court should have submitted the case to the jury under a higher Eighth Amendment standard.[3]

---

1. The complaint also alleged unspecified violations of the First, Fourth, and Sixth Amendments, but Berry did not pursue these claims.

2. The court should not have mentioned the Fifth Amendment. Berry did not plead a Fifth Amendment claim and that amendment protects against deprivations of life, liberty, or property by the federal government. The only federal defendant in this case was dismissed before trial.

3. We have discovered only one case addressing this issue. In *Hamm v. DeKalb County*, 774

F.2d 1567 (11th Cir.1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), plaintiff sought damages for the allegedly unconstitutional conditions existing at a county jail. Plaintiff was incarcerated in the jail both before and after his conviction. The court of appeals agreed with the district court that plaintiff's allegation concerning jail conditions after his conviction would be judged under the Eighth Amendment. *Id.* at 1572. Although *Hamm* appears to have resolved the question in the manner we do here, a recent Eleventh Circuit opinion treats the issue as open. *See Ed-*

■ The rights of pretrial detainees, "those persons who have been charged with a crime but who have not yet been tried on the charge," are not controlled by the cruel and unusual punishment clause of the Eighth Amendment because the Fifth and Fourteenth Amendments prohibit punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) (footnote omitted); *see also Ingraham v. Wright,* 430 U.S. 651, 672 n. 40, 97 S.Ct. 1401, 1413 n. 40, 51 L.Ed.2d 711 (1977) ("Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."). Punishment constrained by the Eighth Amendment can be imposed only when it "follow[s] a determination of guilt after trial or plea...."[4] *Bell v. Wolfish,* 441 U.S. at 536 n. 17, 99 S.Ct. at 1872 n. 17; *see also Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir. 1985).

■ We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished, *Bell v. Wolfish,* 441 U.S. at 534–35, 99 S.Ct. at 1871; and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced. The critical juncture is conviction, either after trial or, as here, by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated. *See Ingraham,* 430 U.S. at 664, 97 S.Ct. at 1408 (Eighth Amendment "was designed to protect those convicted of crimes"); *id.* at 671 n. 40, 97 S.Ct. at 1412 n. 40. For an inmate who has

been convicted but not sentenced, the detention is primarily punitive, not solely prophylactic; therefore, prison brutality, in this case murder by fellow prisoners, is " 'part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eighth Amendment scrutiny.' " *Id.* at 669, 97 S.Ct. at 1411 (quoting *Ingraham v. Wright,* 525 F.2d 909, 915 (5th Cir.1976)).

In *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the Supreme Court recognized that the same facts could give rise to both an Eighth Amendment cruel and unusual punishment claim and a substantive due process claim under the Fourteenth Amendment.[5] *Id.* 475 U.S. at 326–27, 106 S.Ct. at 1087–88. According to the Court, however, "the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified." *Id.* at 327, 106 S.Ct. at 1088.

The Court recently explicitly endorsed the principle, implicit in *Whitley,* that actions which are protected under specific constitutional provisions should be analyzed under those provisions and not under the more generalized provisions of "substantive due process." *See Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (section 1983 claim arising out of use of excessive force in arrest). In *Graham,* the Court analyzed the plaintiff's § 1983 claim of excessive force under the Fourth Amendment reasonableness standard, holding that when government conduct is constrained by "an explicit tex-

---

*wards v. Gilbert,* 867 F.2d 1271, 1274 (11th Cir. 1989).

4. A guilty plea is "itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969); *see also United States v. Crockett,* 812 F.2d 626, 629 (10th Cir.1987).

5. In *Harris v. Maynard,* 843 F.2d 414 (10th Cir. 1988), we held that "wanton or obdurate dis-

regard of or deliberate indifference to the prisoner's right to life as a condition of confinement is a substantive constitutional deprivation whether it falls under the due process clause or the Eighth Amendment." *Id.* at 416 (footnote omitted). Because *Harris* involved a summary judgment claim of qualified immunity, the panel did not discuss whether a lesser showing would have preserved the Fourteenth Amendment claim even though it would not have satisfied the Eighth Amendment.

tual source of constitutional protection ... that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at ——, 109 S.Ct. at 1870 (footnote omitted). Thus, claims of excessive force against convicted prisoners should be analyzed under the Eighth and not the Fourteenth Amendment. *See id.; Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir. 1989). The *Graham* Court then went on to note that "[a]ny protection that 'substantive due process' affords convicted prisoners against excessive force is ... at best redundant of that provided by the Eighth Amendment." U.S. at —— n. 10, 109 S.Ct. at 1871 n. 10.

 Berry's claim is grounded in the defendant's conduct in that city officials were responsible for the conditions which permitted the murder to occur. Thus, we conclude that the Eighth Amendment standards are applicable in this case since that Amendment is the "primary source of substantive protection to convicted prisoners," *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088, in claims alleging failure to protect as well

as those alleging excessive force by governmental actors.[6]

**B**

We now must determine the proper Eighth Amendment test for claims such as Berry's. *Whitley* involved a § 1983 suit brought by a prison inmate alleging a violation of his Eighth and Fourteenth Amendment rights when he was injured during the quelling of a prison riot. The Court held that, in the context of a prison riot, where "decisions necessarily [are] made in haste, under pressure, and frequently without the luxury of a second chance," the Eighth Amendment standard is "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* 475 U.S. at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). This standard, however, does not apply to every Eighth Amendment claim. Even while defining its new "malicious[]

**6.** Every circuit that has considered the question has concluded that the Eighth Amendment is the primary source of substantive rights of prisoners and that, with regard to the rights of *convicted* prisoners, the legal standards under the Eighth and Fourteenth Amendments generally are congruous. *See Meriwether v. Coughlin,* 879 F.2d at 1047 (Eighth Amendment is primary source of convicted prisoners' protection against use of excessive force by prison officials); *Unwin v. Campbell,* 863 F.2d 124, 127 n. 1 (1st Cir.1988); *Stubbs v. Dudley,* 849 F.2d 83, 85–86 (2d Cir.1988) (by implication), *cert. denied,* —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989); *George v. King,* 837 F.2d 705, 707 (5th Cir.1988); *Martin v. Malhoyt,* 830 F.2d 237, 261 n. 76 (D.C.Cir.1987) (dicta); *Meriwether v. Faulkner,* 821 F.2d 408, 415 n. 8 (7th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *Pressly v. Hutto,* 816 F.2d 977, 979 (4th Cir.1987); *Brown v. Smith,* 813 F.2d 1187, 1188 (11th Cir.1987) (per curiam); *Parrish v. Johnson,* 800 F.2d 600, 604 n. 5 (6th Cir.1986); *see also DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, —— n. 5, 109 S.Ct. 998, 1005, n. 5, 103 L.Ed.2d 249 (1989) ("In *Whitley,* ..., we suggested that a similar state of mind [deliberate indifference] is required to make out a substantive due process claim in the prison setting."); *Daniels v. Williams,* 474 U.S. 327, 340 n. 16, 106 S.Ct. 662, 679 n. 16, 88

L.Ed.2d 662 (1986) (Stevens, J., concurring in judgments in *Daniels* and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) ("in these circumstances [inmate injured in attack by fellow inmate], ... the substantive constitutional duties of prison officials to prisoners are defined by the Eighth Amendment, not by substantive due process"); *Davidson v. O'Lone,* 752 F.2d 817, 829 n. 9 (3d Cir.1984) (en banc) (noting that some members of the court believe "the Eighth Amendment standard is the same as that of the substantive due process clause of the Fourteenth Amendment, and that consistency demands that the Fourteenth Amendment not proscribe conduct the Eighth Amendment permits."), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

We agree with the views of the other circuits. Thus, we conclude that the safety and bodily integrity of convicted prisoners implicates both the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's substantive protection against state deprivation of life and liberty without due process of law, and that the legal standards under the two amendments are identical under the facts of this case. Because the Eighth Amendment provides the primary source of protection for prisoners, we will, however, refer to the standard as an Eighth Amendment standard.

and sadistic[ ]" standard, the Court carefully preserved the applicability of its "deliberate indifference" standard, articulated in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1085 ("The deliberate indifference standard articulated in *Estelle* was appropriate in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities."). Other courts have accepted the Supreme Court's invitation to interpret the *Whitley* standard narrowly. *See, e.g., Vaughan v. Ricketts,* 859 F.2d 736, 741–42 (9th Cir. 1988) (digital body cavity searches, "while involving a threat to security, did not constitute an ongoing prison disturbance," and "the officers were not confronted with an instantaneous decision whether to conduct the searches in the manner described"), *cert. denied,* —— U.S. ——, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); *Stubbs v. Dudley,* 849 F.2d 83, 86 (2d Cir.1988) (*"Whitley* does not require that every case involving a guard's failure to protect a prisoner threatened by other prisoners be decided under a heightened standard appropriate for determining the lawfulness of using force to quell a prison riot."), *cert. denied,* —— U.S. ——, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989); *Foulds v. Corley,* 833 F.2d 52, 54–55 (5th Cir.1987) (*Whitley*'s heightened standard does not govern all actions of prison officials "ostensibly under the guise of achieving prison security").

■ After careful consideration, we hold that *Whitley*'s "malicious and sadistic" standard does not apply to the facts of this case; rather, the applicable standard is the traditional "deliberate indifference" inquiry of *Estelle.* Unlike *Whitley,* here there is no danger that the deliberate indifference standard will fail to "adequately capture

the importance of . . . competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088.

■ Deliberate indifference, however, is not self-defining. It does not require a finding of express intent to harm, but "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 319, 106 S.Ct. at 1084; *cf. Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986) (negligence not sufficient to establish substantive or procedural violation of Due Process Clause); *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

Courts have struggled to give a practical meaning to the "deliberate indifference" standard. In *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), the court held that negligence, gross negligence and tort recklessness were all insufficient to justify liability under the Eighth Amendment. With all due respect to that court's analysis, we reject its conclusion that anything less than criminal recklessness by a jailer is per se insufficient to give rise to Eighth Amendment protections.[7] As we see it, in its analysis, the *Duckworth* court collapsed the distinction so carefully preserved in *Whitley* between the malicious and sadistic standard applicable in prison riot situations and the deliberate indifference standard applicable to more ordinary prison policy decisions. *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084. "Deliberate indifference," while requiring a higher degree of fault than negligence, or even gross negligence, *City of Canton v.*

---

7. In adopting its recklessness standard, the Seventh Circuit has chosen the highest recklessness standard stated in any case, *i.e.,* that necessary for a conviction of second degree murder. *See, e.g., Duckworth,* 780 F.2d at 652–53 (example of defendant choking victim, with intent to harm but not kill, who mistakenly kills); *Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir. 1988) (en banc) (act is reckless when actor

"does not care if the other person lives or dies."). We note that varying levels of criminal recklessness exist, from that appropriate for a conviction of "reckless endangerment," to that appropriate for second degree murder. Requiring proof of the latter is too high a standard given the Supreme Court's distinction between *Estelle* and *Whitley.*

*Harris,* 489 U.S. 378, —— & n. 7, 109 S.Ct. 1197, 1204 & n. 7, 103 L.Ed.2d 412 (1989), remains lower than the intentional and malicious infliction of injury reflected in the *Whitley* standard.[8] We, therefore, hold that an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984) (describing reckless conduct as conduct "in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences" (footnotes omitted); *see Germany v. Vance,* 868 F.2d 9, 18 & n. 10 (1st Cir.1989). We believe that this lower standard more exactly captures *Whitley*'s distinction between malicious and sadistic deprivation of rights and deliberate indifference to the deprivation of rights.[9]

The jury instruction given in this case is grounded in negligence and clearly does not meet the deliberate indifference standard. Thus, because we also find that judgment should not be directed in the City's favor, we must remand for a new trial with proper jury instructions based on the Eighth Amendment standard enunciated here. The instructions should caution the jury that mere negligence is not sufficient to impose liability on the City.

## II

The City moved for a directed verdict at the close of Berry's case and renewed its motion at the close of evidence. Following the verdict in favor of Berry, the City moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied both motions. The City argues on appeal that Berry's evidence was legally insufficient under the Eighth Amendment.

■ We review motions for directed verdict and judgment notwithstanding the verdict to determine if there is evidence upon which the jury properly could return a verdict for the nonmoving party. *See, e.g., EEOC v. Sperry Corp.,* 852 F.2d 503, 507 (10th Cir.1988); *Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495, 499 (10th Cir.1984). Like the trial court, we "must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences," but we will not pass upon the credibility of witnesses. *Id.* at 498.

Mark Berry was arrested for the burglary of a National Guard Armory in Durant, Oklahoma. After his arrest, he implicated

**8.** In adopting this standard, we recognize a possible conflict with the language in our earlier opinion, *Wise v. Bravo,* 666 F.2d 1328 (10th Cir.1981). In *Wise,* we stated that a § 1983 action would lie against a police officer if it was proved that his "action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely carelessness or unwise, excessive zeal amounting to an abuse of official power that shocks the conscience." *Id.* at 1332. Taken literally no one could recover under that test unless malice was proved. Such a high standard was not required by the facts of the case, and the cases we cited to support the statement did not articulate such a high standard. Moreover, the Supreme Court's careful distinction in *Whitley* between riot and more ordinary circumstances would seem to reject the imposition of such a high standard in cases like that before us now.

**9.** We note that the Supreme Court has never ruled on the precise relationship among gross negligence, deliberate indifference and recklessness in the Eighth Amendment context. *See, e.g., Daniels,* 474 U.S. at 334–35, 106 S.Ct. at 1091–92 (acknowledging, but not resolving, troublesome distinctions among intent, recklessness and gross negligence). The Court has, however, dealt with the distinction between deliberate indifference and gross negligence in the context of "failure to train" claims under § 1983. *See City of Canton v. Harris,* 489 U.S. 378, —— & n. 7, 109 S.Ct. 1197, 1204 & n. 7, 103 L.Ed.2d 412 (1989). The Court held that deliberate indifference requires proof of *more* culpable conduct than gross negligence. *Id.* Some courts, however, have continued to use the terms "gross negligence" and "deliberate indifference" interchangeably. *See, e.g., Meriwether v. Coughlin,* 879 F.2d 1037 (supervisory liability may be imposed under § 1983 if supervisors acted with "gross negligence or deliberate indifference.").

as his partners in crime, Tony James and Dennis Brown. James and Brown subsequently were arrested. Mark Berry pleaded guilty to a charge that carried a $10,000 fine and/or five years in prison. James and Brown pleaded guilty to charges that carried penalties of $10,000 and/or ten years in prison. All three were held in the Muskogee City–Federal Jail pending sentencing.

Between 5:00 and 5:30 a.m. February 6, 1983, approximately one month after being placed in the Muskogee facility, Mark Berry was murdered by James, Brown, and another prisoner, Sam Van Woudenburg.[10] Using a wire from a broom that had been left in the "day room" of the federal section of the jail, the three men began to strangle the decedent. From the day room, they dragged the decedent into an individual cell and continued to strangle him. Finally, they took Mark Berry into the shower area and hung him from a rod, using towel strips. Evidence at trial indicated that Mark Berry did not die until he was hung in the shower, that death could not have occurred for at least four minutes after the attack began, and that Mark Berry might have lived for as long as ten minutes.

Federal prisoners, including those already convicted but awaiting sentence, were held in a separate, maximum security section of the Muskogee jail, and were allowed twenty-four hour access to each other. Jail policy provided for separation of inmates by sex and age, but there was no policy providing for the separation of crime partners or for separation based on the nature of the crime of which the detainee was charged or convicted. Upon obtaining custody of federal prisoners, the City did not inquire whether a prisoner had implicated other prisoners or was a police informant, for instance, but relied completely on federal officials to inform it of any special circumstances that might justify special arrangements. At the very least, it appears the City was aware that Berry's husband, James, and Brown were codefendants.

At the time the murder was committed, the jail was staffed with one detention officer, who was located approximately twenty-five feet from the federal day room. This detention officer was responsible for the thirteen federal prisoners and an unspecified number of city prisoners then incarcerated. Among other duties, the detention officer monitored a video screen connected to various surveillance cameras located throughout the facility, including one in the federal detention area. It is undisputed that the murder took place within view of a surveillance camera. Under normal circumstances the detention officer's monitor scanned from camera-to-camera at regular intervals; however, when an arrestee was being brought into the jail, the detention officer was instructed to monitor the arrestee's movements without interruption. Thus, when an arrestee was being booked, the detention officer could view only the booking procedure. The detention officer on duty the night of the murder stated that an unusual number of people were booked that night and surmised that he did not see the murder because he "was busy." V R. 238.

Berry testified at trial that (1) her husband expressed fear for his safety, (2) she informed an unidentified jail employee of her husband's fears, and (3) she "asked him [the jail employee] if there was any way he could be moved out of that cell because the guys he informed on was [sic] going to be put in there with him," VIII R. 86. No preventive action was taken.

Berry alleged that the City's policies, practices, and procedures for the operation of its jail caused her husband's death because such policies created the opportunity and means to commit, and resulted in the failure to discover and stop, the murder. Berry's expert witness identified the following City policies[11] as deficient:

(1) The policy of not locking down the prisoners at night was "extremely reckless" and an "extremely serious departure from the accepted standards and

---

**10.** All three subsequently were convicted of Mark Berry's murder.

**11.** The City does not dispute that these were official city policies for purposes of § 1983.

procedures," which allowed unrestricted contact among prisoners at all times. III R. 21–22; 23–24;

(2) The contraband control policy concerning wire brooms, which did not require these items to be inventoried or used on a check-out basis, provided the murderers with a readily accessible and dangerous weapon.[12] *Id.* at 34–36;

(3) The policy of not separating crime partners and allowing them to intermingle on a twenty-four hour basis was extremely dangerous. III R. 38–39; and

(4) The policy of having only one detention officer supervise the entire prison was "grossly inadequate" because of the officer's other duties, and was exacerbated by the non-lock down policy. *Id.* at 25–26.[13]

Berry's expert summarized his testimony by stating that "[t]he ability of these people to roam around, access of crime partners to one another, availability of contraband, [and] lack of staff to oversee the situation, made this murder possible, and the time that it took it was imminently possible." *Id.* at 40.

■ To establish the City's deliberate indifference to her husband's safety under the facts of this case, Berry must show that (1) the City had actual knowledge of the specific risk of harm to her husband or that the risk was so substantial or pervasive that knowledge can be inferred, *see Goka v. Bobbitt,* 862 F.2d 646, 651 (7th Cir.1988); *Vosburg v. Solem,* 845 F.2d 763, 766–67 (8th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 560 (1st Cir.1988); *Meriwether v. Faulkner,* 821 F.2d at 417; *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984); (2) the City failed to take reasonable measures

to avert the harm, *see Goka,* 862 F.2d at 651; *Vosburg,* 845 F.2d at 766–67; *Morgan v. District of Columbia,* 824 F.2d 1049, 1059–60 (D.C.Cir.1987); *Martin v. White,* 742 F.2d at 475; and (3) the City's failure to take such measures in light of its knowledge, actual or inferred, justifies liability for the attendant consequences of its conduct, even though unintended, *see Goka,* 862 F.2d at 651–52 (failure to enforce contraband policy with respect to brooms could be deliberate indifference because of pervasive risk of harm); *Vosburg,* 845 F.2d at 766–67 (risk of sexual assaults pervasive in prisons and defendants failed to respond reasonably; no policy of segregating prisoners in intake based on nature of crime, criminal record, or psychological profile); *Cortes–Quinones,* 842 F.2d at 559–61 (mentally ill prisoner dismembered by cellmates; defendants knew or should have known of mental condition of prisoner; prisoner was not segregated and did not receive treatment); *Martin v. White,* 742 F.2d at 471, 475 (directed verdict for defendant reversed; pervasive risk of sexual assaults in prisons; inadequate patrol procedures; improper positioning of guards; inadequate inmate classification system; inadequate policy for discovering defective cell locks; failure to report assaults and pursue prosecution).

■ Although it is a somewhat close call we believe the deficiencies shown are sufficient that a reasonable jury could find deliberate indifference by the City in the instant case. Berry's case would have been stronger if she had been able to identify the official she allegedly notified of the danger to her husband and he was an official whose knowledge could be imputed to the City.[14] Evidence of prior assaults

---

12. The City's expert witness agreed that a checkout system or formal inventory process would have been more reasonable. In contrast, the plastic eating utensils used by the inmates were inventoried after each meal.

13. Berry also alleged that the detention officer's training was so deficient as to violate the Constitution. Plaintiff presented no evidence, however, to suggest that more extensive training could have prevented the murder. *See City of Canton,* U.S. at ——, 109 S.Ct. at 1205. Thus,

we reject the inadequate training allegation as grounds to support the jury's verdict.

14. Berry testified at trial that she informed a jail employee of her husband's fear for his safety, but she was unable to identify the employee. The City argues that "*no* one [sic] at trial provided credible information that Berry['s] husband was a 'snitch' and, thus, in danger." Brief of Appellant at 4 (emphasis in original). The City refers to Berry's testimony as an "inherently

and/or murders in the jail would have strengthened Berry's case to show the City's above-described policies reflected a deliberate indifference to the risk. We note that Berry presented evidence of an altercation the evening of the murder, and the district court excluded evidence of a prior murder in the federal holding facility within ninety days of Mark Berry's death.

▮ The City also claims there was insufficient evidence that its actions caused Mark Berry's death. A person, including a local municipality, is liable under § 1983 only if it "subjects, or causes to be subjected, any ... person ... to the deprivation of any rights ... secured by the Constitution." Although the test has been variously stated, a municipality is liable under § 1983 if there is a direct causal connection between the municipal policies in question and the constitutional deprivation. *See, e.g., City of Canton v. Harris,* U.S. at ——, 109 S.Ct. at 1201; *City of Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting).

▮ The City, of course, cannot absolutely guarantee the safety of its prisoners, but it has a constitutional duty to take reasonable steps to protect the prisoners' safety and bodily integrity. *E.g., DeShaney,* U.S. at —— – ——, 109 S.Ct. at 1004–07; *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984); *Harris v. Maynard,* 843 F.2d 414, 416 & n. 4 (10th Cir.1988). The City seems to argue that even if it had taken the suggested precautions, Mark Berry may still have been murdered. This argument misses the point. We recognize that assaults and murders will occur in prisons despite the most vigilant of official conduct. The question is whether *this* murder would have occurred had the City taken the suggested precautions, assuming the suggested precautions were reasonable and the City's adherence to its established poli-

cies was reckless in light of its actual or presumed knowledge of the risk of harm. Although neither the City nor any of its employees or agents actually killed Mark Berry, based on the evidence presented in this trial, "a jury reasonably could conclude that the city's conduct was the moving force in bringing about the constitutional violation."[15] *Kibbe,* 480 U.S. at 268, 107 S.Ct. at 1120; *see also Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

### III

The City next argues that the district court improperly instructed the jury on the issue of damages. Its instruction was as follows:

"If you decide for the plaintiff on the question of liability you must then fix the amount of money which will reasonably and fairly compensate the plaintiff for any of the following elements of actual damage proved by the evidence to have resulted from the deprivation of constitutional rights of plaintiff's decedent by the defendant.

One: The nature, extent and duration of damages incurred by plaintiff as a result of the death of Mark A. Berry. In this regard you may consider Mark A. Berry's physical condition prior to his death, his earning capacity, and the contributions he made for the benefit of the plaintiff and his children.

Two: The grief and loss of consortium of the surviving spouse, plaintiff Linnie K. Berry.

Three: The mental pain and anguish suffered by plaintiff's decedent Mark A. Berry.

Four: The pecuniary loss to the surviving plaintiff's spouse and children.

Five: The grief and loss of companionship of plaintiff's decedent's children.

incredible story," *id.* at 5, but such credibility determinations are for the jury.

**15.** As Justice O'Connor noted in *Kibbe,* "the law has been willing to trace more distant causation when there is a cognitive component to the

defendant's fault than when the defendant's conduct results from simple or heightened negligence." 480 U.S. at 257 (citing *Restatement (Second) of Torts* § 501 comment a (1965)).

It is the law of the State of Oklahoma that a wife living with her husband is entitled to the consortium, services, companionship, and society of her husband, and she may recover damages from anyone who through a wrong committed against him may deprive her of such services, consortium, companionship, and society.

The value of the services, consortium, companionship, and society loss, if any, is for the jury to determine from all the evidence."

II R. 10–11. The jury returned a plaintiff's verdict of $100,000, without specifying any allocation of damages.

At trial, the City objected to Berry's testimony outlining her husband's earning capacity. The following bench conference then took place:

"Mr. Priest [counsel for the City]: Your Honor, there has been some testimony, and apparently there is some further anticipated testimony, relating to the issue of damages, specifically previous loss of earning capacity and things like that. I want to register an objection and request a continuing objection, depending on the court's ruling, relating to any damages that would be perhaps proper in a wrongful death case, but which I believe are improper in this case, being a civil rights case....

The Court: This isn't a wrongful death case, this can't be a wrongful death case, do you understand? It is not a wrongful death case.

Mr. Priest: That's correct.

The Court: I just want to make counsel understand that, this isn't a wrongful death case.

Mr. Wells [counsel for Berry]: I understand this is a civil rights case under 1983. But I submit to the court that the measure of the damages and the deprivation is measured by the Oklahoma State Statute on wrongful death...."

II R. 89–90. After taking a recess to research the matter, the trial court ruled that Okla.Stat.Ann. tit. 12, § 1053, the Oklahoma wrongful death statute, upon which the jury instruction ultimately was based,

provided the measure of damages in the case. At the jury instruction conference, the City renewed its objection to a wrongful death measure of damages, although we note the proposed substitute damage instruction proffered by the City subsequently was rejected by the Supreme Court in *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

On appeal, the City argues that the only proper measure of damages is the injury suffered by Mark Berry alone. As we understand its argument, the City would confine damages to those recoverable under Oklahoma's survival statute. *See* Okla.Stat.Ann. tit. 12, § 1051. This would significantly reduce the amount of damages available to Berry. At least one commentator has asserted that the only damages recoverable in an Oklahoma survival action are for property loss and loss of earnings by decedent between the time of injury and death; the availability of damages for pain and suffering, lost earnings, funeral and burial expenses, and punitive damages in a wrongful death action precludes recovery of such damages in a survival action. Note, *Recovery for Wrongful Death,* 34 Okla.L.Rev. 659, 671 (1981). Despite this commentator's view, it is not clear whether the 1978 amendments to Oklahoma's wrongful death statute, which greatly expanded the kinds of damages available in a wrongful death action, removed all traditional damages from survival actions in that state. Traditionally at common law a survival action allowed the decedent's estate to recover for (1) decedent's pain and suffering before death, (2) decedent's lost earnings before death, (3) decedent's loss of property before death, and (4) punitive damages. *Mathies v. Kittrell,* 354 P.2d 413, 414–15 (Okla.1960); *Gilbreath v. Phillips Petroleum Co.,* 526 F.Supp. 657 (W.D.Okla.1980). But the fact that the wrongful death statute allocates virtually all recoveries to particular individuals, to the exclusion of decedent's creditors and beneficiaries under a will, suggests they are not available in a survival action. *See Kimberly v. DeWitt,* 606 P.2d 612, 615 (Okla.Ct.App.1980) (implying that

damages recoverable in a wrongful death action may not be obtained in a survival action).

Berry is the duly appointed administratrix of the Estate of Mark A. Berry, deceased. The complaint clearly asserts .a survival action on behalf of the estate under Okla.Stat.Ann. tit. 12 § 1051, and a wrongful death claim under Okla.Stat.Ann. tit. 12 § 1053, an option permissible under Oklahoma law. *See Hale v. Hale,* 426 P.2d 681 (Okla.1967); Note, 34 Okla.L.Rev. at 672.

The difficult question we face here is whether damages in a § 1983 action in which death occurs are limited to those recoverable under the Oklahoma survival action alone, or to those recoverable by such a survival action and an Oklahoma wrongful death suit, or whether damages are determined by some federal standard either as a survival or wrongful death-type action not defined or limited by state law.

Section 1983, which is derived from § 1 of the Civil Rights Act of 1871, creates a cause of action in favor of "the party injured" against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any ... person ... to the deprivation of any rights ... secured by the Constitution and laws."

42 U.S.C. § 1983. Although § 1983's "unique remedy make[s] it appropriate to accord the statute 'a sweep as broad as its language,' " its lack of detail leaves little to construe. *Wilson v. Garcia,* 471 U.S. 261, 272, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985) (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)) (footnote omitted); *see also Monell,* 436 U.S. at 685, 98 S.Ct. at 2033 ("in both Houses, statements of the supporters of § 1 corroborated that Congress, in enacting § 1, intended to give a broad remedy for violations of federally protected civil rights.") (footnote omitted).[16] The task of courts attempting to give content to § 1983's protection is, therefore, correspondingly difficult.

We are satisfied that Congress intended significant recompense when a constitutional violation caused the death of a victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy. *See Monroe v. Pape,* 365 U.S. 167, 174–76, 81 S.Ct. 473, 477–78, 5 L.Ed.2d 492 (1961), *overruled in part, Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Steinglass, *Wrongful Death Actions and Section 1983,* 60 Ind. L.J. 559, 645–47 (1985).[17]

**16.** Representative Shellabarger of Ohio, who presented the bill to the House and served as its floor manager, described how the act should be interpreted by courts:

"This act is remedial, and in aid of the preservation of human liberty and human ʼrights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation. As has been again and again described by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people."

Cong.Globe, 42d Cong., 1st Sess., app. at 68 (1871).

**17.** Additional support for reading § 1983 as intending a remedy for wrongful killings under color of law comes from an examination of a criminal civil rights act counterpart. Section 1 of the 1871 act was modeled after the criminal provision contained in § 2 of the Civil Rights Act of 1866 (current version at 18 U.S.C. § 242). *See Monroe,* 365 U.S. at 185, 81 S.Ct. at 483; Cong.Globe, 42d Cong., 1st Sess., app. at 68 (statement of Rep. Shellabarger). With the exception that § 1 of the 1871 act was not limited to former slaves as was the earlier enactment, Rep. Shellabarger informed the House that § 1 of the proposed act was intended to establish a civil remedy in cases in which § 2 of the 1866 act created a criminal sanction. *Id.* Thus, "[b]ecause § 2 of the Civil Rights Act of 1866 had extended the criminal sanction to situations in which persons acting under color of state law deprived others of their life, there can be little doubt that § 1 of the Civil Rights Act of 1987 was also intended to provide a civil remedy in such cases." Steinglass, *supra,* at 648; *see also Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Brazier v. Cherry,* 293 F.2d 401, 404 & n. 9 (5th Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961).

President Grant's message to Congress in 1871 described conditions in the South that "render[ed] life and property insecure" and urged legislation that would "effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States." Cong.Globe, 42d Cong., 1st Sess. 236 (1871). The floor debates concerning the proposed act reflected the President's concern. Representative Lowe of Kansas commented as follows:

"While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress. If there is no remedy for this, if the rights of citizenship may be denied without redress, if the Constitution may not be enforced, if life and liberty may not be effectively protected, then, indeed, is our Government a failure, and instead of enjoying liberty regulated by law, its subjects may live only by the sufferance of lawless and exasperated conspirators."

*Id.* at 374. Representative Smith of New York noted that "[m]en are murdered; their property is burned or otherwise destroyed; they are scourged, and the local law is not administered so as to demonstrate its power to reach these offenses or to defend the citizens who are subject to them." *Id.* at 392.

Although Congress clearly envisioned § 1983 to serve as a remedy for wrongful killings that resulted from the proscribed conduct, the statute itself does not provide a mechanism to implement such a remedy. *See, e.g., Bell v. City of Milwaukee,* 746 F.2d 1205, 1239 (7th Cir.1984); *Brazier v. Cherry,* 293 F.2d 401, 404–05 (5th Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961). For instance, when the constitutional violation has resulted in death, § 1983 does not specify whether the cause of action it creates survives the death, who are the injured parties, the nature of the claims that may be pursued or who may pursue them, or the types of damages recoverable.

We are not left totally without guidance, however, in that 42 U.S.C. § 1988 authorizes federal courts to undertake a three-step process to determine whether to borrow law from another source to aid their enforcement of federal civil rights statutes. *See, e.g., Wilson v. Garcia,* 471 U.S. at 267, 105 S.Ct. at 1942; *Burnett v. Grattan,* 468 U.S. 42, 47–48, 104 S.Ct. 2924, 2928, 82 L.Ed.2d 36 (1984). Section 1988 first directs that courts look to federal law "so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect." 42 U.S.C. § 1988. Second, if federal law is "not adapted to the object" or is "deficient in the provisions necessary to furnish suitable remedies and punish offenses," courts must consider borrowing the law of the forum state.[18] *Id.* Third, the federal court must reject the application of state law if it is "inconsistent with the Constitution and laws of the United States." *Id.*

The Supreme Court once granted certiorari to consider whether § 1983, independently or in conjunction with state law, may be used by survivors when the decedent's death resulted from a constitutional violation, and, if so, whether state law must be used as the measure of damages.

---

**18.** Section 1988 does not specify when federal law is deficient or what federal law courts must look to before making a deficiency finding. *See generally* Eisenberg, *State Law in Federal Civil Rights Cases: The Proper Scope of Section 1988,* 128 U.Pa.L.Rev. 499 (1980); Kreimer, *The Source of Law in Civil Rights Actions: Some Old Light on Section 1988,* 133 U.Pa.L.Rev. 601 (1985); Steinglass, *supra* at 612–25. Nor has the Supreme Court helped us, thus far, in construing the deficiency clause. We are confident, however, that federal law, whatever its scope may be, is deficient here because the Supreme Court in *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), found it deficient in the analogous area of survival of § 1983 actions.

*Jones v. Hildebrant,* 432 U.S. 183, 184–85, 97 S.Ct. 2283, 2284–85, 53 L.Ed.2d 209 (1977). But it dismissed the case without deciding the issue because the claim of the plaintiff-petitioner, mother of the decedent, was not based on her son's death, but on deprivation of her own personal liberty. *Id.* at 185, 97 S.Ct. at 2285. *See also O'Dell v. Espinoza,* 456 U.S. 430, 102 S.Ct. 1865, 72 L.Ed.2d 237 (1982), *dismissing cert. for want of jurisdiction,* 633 P.2d 455 (Colo.1981).[19]

In *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), the Supreme Court addressed for the first time the relationship among §§ 1983, 1988, and state survival policies. The pretrial death of the plaintiff in *Robertson* was unrelated to his § 1983 action. Under the law of the forum state, Louisiana, the action abated upon the death of the plaintiff. The Court proceeded to adopt Louisiana law, holding that the decedent's executor had no cause of action to pursue. *Id.* at 588, 98 S.Ct. at 1994. In the Court's analysis, abatement of the cause of action when death did not result from the illegality did not so undermine the compensation and deterrence goals of § 1983 that state law should be rejected. *Id.* at 592 & n. 10, 98 S.Ct. at 1996 & n. 10. The Court was careful, however, to distinguish instances in which the illegal conduct caused the plaintiff's death, *id.* at 592, 594, 98 S.Ct. at 1996, 1997, and noted that its rationale would not "preclude survival of a § 1983 action when such is allowed by state law, nor does it preclude recovery by survivors who are suing under § 1983 for injury to their own interests." *Id.* at 592 n. 9, 98 S.Ct. at 1996 n. 9 (citation omitted).

One other Supreme Court case commands our attention on this issue. *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), held that § 1988 alone does not "authorize the feder-al courts to borrow entire causes of action from state law." *Id.* at 702, 703–04, 93 S.Ct. at 1792, 1792–93. Petitioners in *Moor* sought to recover damages against a municipality based on § 1983 at a time when municipalities were not subject to such liability under the doctrine of *Monroe v. Pape.* Petitioners argued that § 1988 authorized the adoption of a state law that exposed municipalities to vicarious liability for violations of § 1983. The Supreme Court rejected this argument because § 1988 does not independently create a federal cause of action for the violation of federal civil rights. On the contrary, application of § 1988 "is restricted to those contexts in which Congress has in fact authorized resort to state and common law." *Moor,* 411 U.S. at 701, 93 S.Ct. at 1791 (footnote omitted). One such context, the Court stressed, was to provide remedial assistance to civil rights statutes that were "unsuited or insufficient" to enforce the substantive right. *Id.* at 702–03, 93 S.Ct. at 1792. Under then existing federal law, municipalities were not independently subject to suit under § 1983; thus, incorporation of state law would have subjected municipalities to federal liability they otherwise would not have faced. *Id.* at 706, 710, 93 S.Ct. at 1794, 1796.

From our analysis, we conclude that Congress envisioned a significant remedy for wrongful killings resulting from conduct proscribed by § 1983 but did not provide specific guidance regarding whether that would be realized under a federal or state survival action or by other means. Moreover, beyond providing compensation for victims of illegal conduct, it is clear that § 1983 was intended to provide special deterrence for civil rights violations. The Supreme Court has not directly considered the issue, but language in *Robertson* appears to encourage reference to state law in defining the scope and content of remedies available. In contrast, *Moor* may be

---

**19.** The Supreme Court, however, has had before it at least one § 1983 case brought by the personal representatives of decedents, that sought wrongful death damages. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *discussed in Jones,* 432 U.S. at 189 n. 1, 97 S.Ct. at 2287 n. 1. As Justice White noted

in dissent in *Jones,* "[a]lthough the question whether the personal representatives' action could be maintained under § 1983 was not before the Court, it did not disapprove of such actions in remanding the case to the lower courts." *Jones,* 432 U.S. at 190 n. 1, 97 S.Ct. at 2287 n. 1.

read as a caution to plaintiffs and federal courts against borrowing of state-created causes of action.

■■■ Applying the principles set out in § 1988 for borrowing law from another source, we are satisfied that the Oklahoma survival action alone does not meet the stated criteria. As applied to the instant case, it would provide extraordinarily limited recovery, possibly only damages to property loss, of which there were none, and loss of decedent's earnings between the time of injury and death, of which there also were none. *See* Note, 34 Okla.L.Rev. at 671. Thus, the Oklahoma survival action is clearly deficient in both its remedy and its deterrent effect.

The more difficult question is whether the Oklahoma law on survival actions, as supplemented by Oklahoma's wrongful death statute, sufficiently meets the § 1988 criteria to satisfy the test for borrowing state law. We must be careful in answering this question to avoid transgressing *Moor*'s prohibition of borrowing complete causes of action under the guise of vindicating rights under § 1983.

This circuit has not fully considered the question. In *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1190 (10th Cir.1985), we held a mother and sister had no § 1983 cause of action arising out of a victim's death unless the unconstitutional act was directed at and intended to deprive them of their personal constitutional rights. The plaintiffs in *Trujillo* contended that the defendant violated their right to freedom of intimate association, guaranteed by the First and Fourteenth Amendments, by killing their brother/son. The plaintiffs, therefore, brought a § 1983 claim, independent of the claim the victim would have had, asserting violation of plaintiffs' own constitutional rights. In *Trujillo*, we specifically distinguished cases, like the one at bar, in which the plaintiff alleges "a derivative right on the decedent's behalf." *Id.* at 1187 n. 3.[20]

In other cases this circuit has entertained § 1983 suits spurred by allegedly unconstitutional state action that resulted in death, but has failed to discuss the source of plaintiffs' representative or survivor standing because no one raised the question on appeal. *See, e.g., Perrin v. Anderson*, 784 F.2d 1040 (10th Cir.1986); *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir.1985); *Tuttle v. City of Okla. City*, 728 F.2d 456 (10th Cir.1984), *rev'd on other grounds*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

One problem with looking to the wrongful death statute is that traditionally these statutes have been viewed as creating a new cause of action for the benefit of survivors. *See, e.g., L.E. Whitman Constr. Co. v. Remer*, 105 F.2d 371, 375 (10th Cir. 1939) (interpreting Oklahoma law). And *Moor* appears to prohibit adopting "entire" state causes of action. 411 U.S. at 702, 93 S.Ct. at 1792. Taking that approach, the Sixth Circuit has refused to adopt state wrongful death schemes in § 1983 actions. *Jaco v. Bloechle*, 739 F.2d 239, 242–43 & n. 5 (6th Cir.1984). Arguably *Moor* does not compel this result. Wrongful death statutes create new causes of action in the most technical sense simply because such actions were unknown at common law and the decedent's survivors did not have a cause of action for the decedent's personal injuries while he lived. *Rios v. Nicor Drilling Co.*, 665 P.2d 1183, 1185–86 (Okla. 1983); *Haws v. Luethje*, 503 P.2d 871, 873, 874 (Okla.1972).[21] The substantive right,

---

**20.** *Dohaish v. Tooley*, 670 F.2d 934 (10th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), an action to compel prosecution of the murderer of plaintiff's decedent, bears a superficial resemblance to both *Trujillo* and to the instant case. It is, however, distinguishable in that: (1) the alleged civil rights violation did not occur until after the death of the decedent, and did not, therefore, cause the decedent's death; and (2) the plaintiff lacked the right to pursue his § 1983 action because he could not allege a specific harm that he had

suffered from the prosecutor's refusal to prosecute. Dohaish's action was not a § 1983 action to compensate a survivor for the death of a relative.

**21.** As Professor Steinglass has noted,

"At one time wrongful death claims were viewed as new and independent actions, and they must still be distinguished from survival claims to keep clear the different interests at stake and the different measure of damages.

however, is that of the decedent. *Rios*, 665 P.2d at 1186; *Haws*, 503 P.2d at 874–75.[22] We believe that the "new" cause of action theory would not warrant rejection of state wrongful death remedies as appropriate to vindicate § 1983 violations when death results.

We believe a strong argument can be made that borrowing state wrongful death statutes simply provides remedial assistance "to effectuate well-established primary rules of behavior" that are enforceable under § 1983. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (creating common law wrongful death action in admiralty). When the alleged constitutional violation results in death, Congress, through § 1988, has authorized resort to state law to assist the broad remedial policies of § 1983. *See Moor*, 411 U.S. at 701, 702–03, 93 S.Ct. at 1791, 1792. The *Brazier* court adopted this view, commenting on the meaning of the phrase "suitable remedies" in § 1988, as follows:

> "Used, as it was in parallel with the phrase 'and punish offenses against law,' it comprehends those facilities available in local state law but unavailable in federal legislation, which will permit the full effectual enforcement of the policy sought to be achieved by the statutes. And in a very real sense the utilization of local death and survival statutes does not do more than create an effective remedy. This is so because the right is surely a federally protected one—the right to be free from deprivation of constitutional civil rights. The local death or survival statute adopted by reference in this fashion does not add to that substantive right. It merely assures that there will be a 'remedy'—a way by which that right will be vindicated—if there is a violation of it."

293 F.2d at 408–09. *Accord Smith v. Wickline*, 396 F.Supp. 555, 559–60 (W.D. Okla.1975) (borrowing Oklahoma's wrongful death statute in a § 1983 claim); *see also Moragne*, 398 U.S. at 381–82, 90 S.Ct. at 1777–78. ("Because the primary duty already exists, the decision whether to allow recovery for violations causing death is entirely a remedial matter."). Moreover, *Robertson* can be read as a strong signal by the Supreme Court that it is appropriate to look to state law survival and wrongful death statutes to supply an appropriate remedy for § 1983 violations that result in death. *Cf. Carey v. Piphus*, 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252

Nonetheless, the claims are integrally related, and a number of states do not even maintain independent wrongful death remedies; rather, they simply permit wrongful death claims to be pursued in enlarged survival actions." Steinglass, *supra* at 621 (footnotes omitted). With the wide divergence among states in the handling of survival and wrongful death actions, the blanket characterization of wrongful death remedies as new causes of action that cannot be incorporated under § 1988 is a gross oversimplification. Such archaic and formalistic distinctions led to the adoption in this country of the English common law rules refusing to recognize survival or wrongful death actions. *See generally Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *Van Beeck v. Sabine Towing Co.*, 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685 (1937). Thus, legislatures were forced to enact statutes that recognized survivors' remedial interests in the life of their decedents.

22. If wrongful death statutes truly created new causes of action, one might expect that actions of the decedent before death concerning *his* cause of action would not affect his *survivors'* statutorily created cause of action. But, as is true in most states, Oklahoma views wrongful death actions as derivative claims that depend upon the existence of a right of action in the decedent before death. *Rios*, 665 P.2d at 1186; *Haws*, 503 P.2d at 874–75; W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton On Torts* 954–55 (5th ed. 1984). Thus, in Oklahoma when the decedent settled his claims for personal injuries during his lifetime or a workers' compensation scheme applied and provided an exclusive remedy, a wrongful death remedy was barred although such an action is for the benefit of survivors and does not result in a double recovery. *Rios*, 665 P.2d at 1185–86 (Oklahoma's workers' compensation scheme is exclusive and precludes any right of action decedent might have had; thus, survivors had no wrongful death remedy); *Haws*, 503 P.2d at 874–75 (decedent settled his claims for personal injuries before death; thus, survivors had no wrongful death remedy); *compare Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (federal common law wrongful death action in admiralty not barred by decedent's recovery for personal injuries during his lifetime).

(1978) (*citing Jones v. Hildebrant*, 432 U.S. 183, 190–91, 97 S.Ct. 2283, 2287–88, 53 L.Ed.2d 209 (1977) (White, J., dissenting)).

On the other hand, if we were to define § 1983 remedies in terms of the state survival action, supplemented by the state wrongful death act, we place into the hands of the state the decision as to allocation of the recovery in a § 1983 case, and, indeed, whether there can be any recovery at all. In an Oklahoma wrongful death action nearly all recoverable damages are expressly funneled to the decedent's surviving spouse and children to the exclusion of decedent's creditors or the beneficiaries of the decedent's will, if he or she has one. *See* Okla.Stat.Ann. tit. 12, § 1053(B). The statute also permits recovery for loss of consortium and grief of the surviving spouse, grief and loss of companionship of the children and parents, *id.*, items decedent could not have recovered had he lived to sue for himself.

Allowing the state determinations to prevail also permits the state to define the *scope and extent of recovery.* For instance, some states may preclude, or limit, recovery for pain and suffering or for punitive damages. In addition, some state laws may deny all recovery in particular circumstances, as when wrongful death actions must be for dependents and there are none.

In *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court ruled that punitive damages are recoverable in § 1983 cases. In reaching this conclusion the Court relied on the common law of torts, but not the common or statutory law of any one particular state. The rule announced in *Smith* is a general one, not one specific to Missouri (the forum state) based on state law remedies. There is no stated exception for § 1983 actions brought in states that do not permit punitive damage awards in other tort cases. Similarly, in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the Court looked to the common law of torts to hold that the abstract value of constitutional rights is not a permissible element of compensatory damages in § 1983 cases. But it

did not make the rule different for suits brought in states that might have a different notion. The Court did not rely on borrowing the law of the forum state, but instead laid down a uniform rule. In *Wilson v. Garcia*, the Supreme Court looked to state law for statutes of limitations, but it did not permit the state law to define the cause of action. These cases suggest that the Supreme Court is fashioning a federal common law of remedies for § 1983 violations.

In the case before us the recovery permitted under the Oklahoma wrongful death act duplicates, in many respects, the recovery Mark Berry might have obtained had he lived to sue for his injuries. But, as we have noted, the act permits recovery of the loss of consortium and grief of the surviving spouse, children, and parents, which Mark Berry could not have recovered had he lived. Okla.Stat.Ann. tit. 12 § 1053(B). In considering whether the purposes of § 1983 are satisfied by adoption of state survival and wrongful death actions, we must consider that different states will define them differently, thus requiring individual analyses of each state's law. We might have to find that a state's law works satisfactorily in some instances, as when there are surviving dependents, but not in other cases, as when there is no one with a right to sue.

Weighing these concerns, and considering the Supreme Court's approach in *Smith, Memphis Community School District,* and *Garcia,* we conclude that supplementing a state survival action with a state wrongful death action does not satisfy the criteria of § 1988 for borrowing state law. The laws are not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim; they are deficient in some respects to punish the offenses. Application of state law, at least in some instances, will be inconsistent with the predominance of the federal interest.

We therefore conclude, as did the Sixth Circuit in *Jaco,* that the federal courts must fashion a federal remedy to be applied to § 1983 death cases. The remedy should be a survival action, brought by the

estate of the deceased victim, in accord with § 1983's express statement that the liability is "to the party injured." 42 U.S.C. § 1983. It must make available to plaintiffs sufficient damages to serve the deterrent function central to the purpose of § 1983. In accord with *Smith*, punitive damages may be recovered in appropriate cases. As for compensatory damages we look to the Supreme Court's statement in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986):

> "We have repeatedly noted that 42 U.S.C. § 1983 creates 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution. Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined accordingly to principles derived from the common law of torts.
>
> ... [D]amages in tort cases are designed to provide '*compensation* for the injury caused to the plaintiff by the defendant's breach of duty.' To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.' "

*Id.* at 305–07, 106 S.Ct. at 2541–43 (citations and footnotes omitted) (emphasis in original). We believe appropriate compensatory damages would include medical and burial expenses, pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions.

The state wrongful death actions are not foreclosed by this approach; they remain as pendent state claims. But, of course, there can be no duplication of recovery.

Because the court's instructions to the jury were those for a wrongful death action, the court erred in instructing the jury. Since the case must be remanded for a new trial, we do not address whether the award of attorneys' fees to Berry was proper.

The judgment of the district court is VACATED and the cause is REMANDED for a new trial.

McKAY, Circuit Judge, concurring in part and concurring in judgment, and dissenting in part:

I join Judge Logan's opinion insofar as it discusses the appropriate standards to be applied once eighth amendment analysis is triggered. I also join his opinion in that part which deals with the appropriate measure of damages.

I dissent only from that portion of the opinion which concludes that eighth amendment analysis rather than due process analysis under the fourteenth amendment should apply on the facts of this case. While in the end it may make very little difference, under the present state of the law I think it makes enough difference to justify careful delineation of what cases are governed by the eighth amendment and what cases are governed by what I consider to be the more lenient threshold of liability provided by due process analysis. It is true, as the court's opinion points out, that at least in the prison setting after sentencing, most, if not all, cases of abuse by prison officials will be governed by eighth amendment analysis which expressly circumscribes punitive action deliberately or near deliberately taken. However, as the court itself acknowledges, the rights of pretrial detainees are more properly analyzed from the perspective of the duty of care owed to persons who are being processed under some form of government compulsion. In some cases, the results derived from such difference in analysis may be the same. In others, there may be a substantial difference.

Heretofore the cases appear to have discussed the eighth amendment and due process clause dichotomy as though there were only two clean categories of detained persons: "pretrial detainees" and "convicted persons." None of the cases have dealt with this specific nuance of determining precisely what is meant by "pretrial detain-

ee" and "convicted person" for purposes of which constitutional standard appropriately applies to them. Both of those phrases are over-generalized for purposes of the analysis at issue in this case. The context in which the examination takes place governs everything. As this court's own precedent indicates, in the double jeopardy context "[u]ntil entry of judgment and sentencing on the accepted guilty plea, defendant ha[s] not been formally convicted." *United States v. Combs*, 634 F.2d 1295, 1298 (10th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981). *See also United States v. Goldman*, 352 F.2d 263 (3d Cir.1965) (holding that acceptance of guilty plea on one count that qualifies as lesser included offense as compared to second count does not bar continuation of trial on second count under double jeopardy); *High v. United States*, 288 F.2d 427 (D.C. Cir.), *cert. denied*, 366 U.S. 923, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961) (holding that sentencing is critical to finality, thus, mere acceptance of guilty plea does not bar withdrawal of plea). For all the reasons given by this court in *Combs* demonstrating the lack of finality even of an accepted plea and related policy problems, it seems to me that the critical act which should govern the applicability of the more specific eighth amendment standard over the overlapping due process standard is the sentencing process. Up to sentencing, the dominant theme of the state's control over the defendant is processing. Once sentencing takes place, that sentencing and what follows makes the dominant role of the state one of implementing punishment, the matter addressed in the eighth amendment clause. I simply cannot accept as a correct analysis of the factual situation the court's assertion that: "For an inmate who has been convicted but not sentenced, the detention is primarily punitive, not solely prophylactic...." Sentencing is the *sine qua non* of punishment. As this court pointed out in *Combs*, 634 F.2d at 1298, many things can happen after the acceptance of a guilty plea that may derail the imposition of sentence. Consequently, the better rule would be to keep sentencing (the declaration of punishment) as the bright line dividing

point between due process analysis and the more specific (and less restrictive) eighth amendment standard.

Unlike the majority, I find substantial reason for drawing the line at sentencing rather than the nonfinal stages of conviction or an accepted plea of guilty. Sentence has a long history as the bright line in the criminal prosecution context. It has finality, it has appealability, it has double jeopardy, etc. By applying this bright line to determine which of the Supreme Court's two standards should apply, we avoid the possibility of the hybrid situation presented in *Combs*. There, the defendant pled guilty to a lesser included offense in one count but remained incarcerated pending trial on the greater offense in another count contained in the same indictment. I have yet to see an explanation either in the court's opinion or in any other context why following this bright line geared to the imposition of punishment (sentencing) would create any mischief. Because the Supreme Court itself has drawn the line between detainees and sentenced prisoners, we should not extend the analytical collapsing of due process and eighth amendment analyses into what may be described best as a twilight zone.

The question remains what standard of conduct should apply in order properly to analyze due process cases under the fourteenth amendment. The Supreme Court looked at the fourteenth amendment but did not resolve what the appropriate standard should be in *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and its companion case, *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In those cases, the Court simply held that plain negligence was not enough to trigger a fourteenth amendment violation. *See Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 664; *Davidson*, 474 U.S. at 334, 106 S.Ct. at 666. The Court expressly reserved judgment as to whether "something less than intentional conduct, such as recklessness or 'gross negligence' was enough." *Daniels*, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3.

Since *Daniels*, the Court has shed little light on the question. In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court considered a section 1983 action brought against the city of Canton, Ohio when city police officers arrested the plaintiff but failed to obtain proper medical care for her. In *Harris*, the Court held that the city could be held liable under section 1983, but that there must be a direct causal link between an established city policy or procedure and the due process violation that resulted. *See Harris*, 109 S.Ct. at 1203. Harris' action was based on the allegation that the city's policy toward officer training caused the officers to violate her rights. The decision in *Harris*, therefore, turned on whether the city's failure to train its officers met the level of culpability necessary for its failure to rise to the level of a due process violation. As to what level of culpability applied, the Court held that a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 1204.

The Court's recent pronouncement in *Harris* nevertheless fails to establish a rule regarding the standard of conduct required for a due process violation. Indeed, the Court expressly limited its holding to cases involving the failure to train municipal employees. *See id.* at 1204 n. 8. As to what degree of culpability would be required for a direct due process violation, the Court stated:

> The "deliberate indifference" standard we adopt for § 1983 "failure to train" claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation. For example, this Court has never determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this case—a denial of the due process right to medical care while in detention—is established. Indeed, in *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 243–245, 103 S.Ct. 2979, 2982–2983, 77 L.Ed.2d 605 (1983), we reserved the decision on the question of whether something less than the Eight Amendment's "deliberate indifference" test may be applicable in claims by detainees asserting violations of their due process right to medical care while in custody.

> We need not resolve here the question left open in *Revere*. . . .

Based on its statements in *Daniels* and *Canton*, the Court has not resolved the question of what standard of conduct must have been violated in order for plaintiff to demonstrate a due process violation in this case. It is clear, however, that section 1983 is a remedial statute designed to protect individuals from governmental entities whose policies deprive them of their constitutional rights. I believe that the policies underlying the statute are best effectuated by adopting a gross negligence standard. Consequently, I would join those circuits holding that proof of gross negligence is enough to sustain a section 1983 action involving a fourteenth amendment due process claim. *See, e.g., Nishiyama v. Dickson County*, 814 F.2d 277, 282 (6th Cir. 1987) (gross negligence sufficient); *Colburn v. Upper Darby Township*, 838 F.2d 663, 669 (3d Cir.1988) (obligation not to act with reckless indifference); *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th Cir. 1988) (recklessness is sufficient); *see also Wood v. Ostrander*, 879 F.2d 583, 587–88 (9th Cir.1989) (discussing *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and concluding that the question of the proper degree of culpability is still unsettled).

Because I agree with the court that there is sufficient evidence in the record to meet its eighth amendment standard, *a fortiori*, I believe the record evidence is more than sufficient to meet this due process standard. I would direct the court to instruct the jury under a gross negligence standard.

TACHA, Circuit Judge, concurring.

I concur with the majority's conclusion in Part III of the court's opinion concerning the appropriate measure of compensatory damages for Berry's survival claim. I write this special concurrence to make

clear my position that a wrongful death action cannot be equated with a survival action under 42 U.S.C. sections 1983 and 1988. In my view the Supreme Court precluded that result in *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

Berry brought two claims under 42 U.S.C. section 1983; a survival action on behalf of her deceased husband, and a wrongful death action on behalf of herself and her children. The majority ignores the critical threshhold issue of whether Berry's wrongful death claim seeks recompense for a personal deprivation of a federal right secured by the Constitution or by federal laws, *see City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985) (plurality opinion), and instead jumps to the question of the appropriate measure of damages for Berry's survival claim.

Applying the Supreme Court's three-step test analysis for determining an appropriate remedy under section 1988, *see Wilson v. Garcia,* 471 U.S. 261, 267–68, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985), the majority looks to the Oklahoma survival statute, Okla.Stat.Ann. tit. 12, § 1051 (1988). The majority concludes, and I agree, that adopting the measure of damages outlined in the Oklahoma survival statute, which here would result in no recovery, would be inconsistent with the federal policies underlying section 1983, *see Robertson v. Wagman,* 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978).

At this point in the analysis, having found the Oklahoma state law remedy for a survival action to be inadequate, the court should fashion a federal common law remedy responsive to the federal policies underlying section 1983. *See Wilson,* 471 U.S. at 269, 105 S.Ct. at 1943 (quoting *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969)). The majority, however, deviates from the *Wilson v. Garcia* three-step analysis and instead engages in a "substance over form" discussion of the Oklahoma wrongful death statute, Okla.Stat. Ann. tit. 12, § 1053 (1988), as a potential

"supplemental" state law remedy capable of adoption under section 1988. In its discussion of section 1988, the majority adopts *sub silentio* Berry's state law wrongful death claim as a federal right under section 1983. The majority thus, in my opinion, violates the principle laid down in *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), that federal courts cannot use section 1988 to bootstrap state law onto section 1983 and thereby create new federal causes of actions under the guise of vindicating federal rights.

Well aware of the *Moor* problem raised by its consideration of the Oklahoma wrongful death statute as a remedy for Berry's survival action, the majority dismisses this concern by asserting that "[w]rongful death statutes create new causes of action [only] in the most technical sense," and that "[t]he substantive right [asserted in a wrongful death action], however, is that of the decedent." Maj. op. at 1504.

I respectfully disagree with the majority's conclusion that federal courts can equate wrongful death and survival actions for purposes of sections 1983 and 1988. *See* maj. op. at 1505. A survival action seeks to vindicate the decedent's rights. In contrast, a wrongful death action seeks to vindicate the rights of the surviving family members or heirs. *See St. Louis, I. M. & S. Ry. Co. v. Craft,* 237 U.S. 648, 658, 35 S.Ct. 704, 706, 59 L.Ed. 1160 (1915) (survival claim is for wrong to injured person, wrongful death claim is for wrong to beneficiaries); W. Prosser & W. Keeton, *The Law of Torts* §§ 125A–127 (5th ed. 1984) (survival and wrongful death actions assert different rights); Martin, *Wrongful Death in Oklahoma,* 11 Okla.City L.Rev. 287, 293, 307 (1986) (same).

The Oklahoma wrongful death statute clearly extends beyond the scope of the decedent's rights and creates a state law cause of action on behalf of the survivors to compensate them for *their own personal injuries* caused by the wrongful killing of the decedent. The Oklahoma wrongful death statute authorizes damages for the loss of consortium and grief of the surviv-

ing spouse and the grief and loss of companionship of the children and the parents of the decedent. *See* Okla.Stat.Ann. tit. 12, § 1053(B) (1988). These damages patently are not vindicating the substantive rights of the decedent. Indeed, the majority implicitly recognizes this point later in the opinion when, in fashioning a federal common law remedy for Berry's survival claim, the court essentially adopts the measure of damages authorized by the Oklahoma wrongful death statute, *but omits compensation for the injuries to Berry and her children due to the loss of their relationship with the decedent.*

In summary, Berry has not shown that her wrongful death rights derive from the Constitution or from federal laws. She therefore cannot make out a federal wrongful death claim under section 1983. It is error for this court to imply otherwise by equating Berry's survival and wrongful death actions in its discussion of an appropriate remedy under section 1988.