F I L E D
United States Court of Appeals
Tenth Circuit

OCT 29 1997

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

TENST CIRCUIT

ROBERT BRUCE BRIGDEN, Deceased, by
and through his Wife and Next of Kin; JANE
CHURCHILL BRIGDEN, Widow and
Personal Representative of the decedent
Robert Bruce Brigden; DAVID BRUCE
BRIGDEN; PAMELA JANE BRIGDEN
OGDEN; JANICE ELAINE BRIGDEN
JEFFUS; ALLEN CHURCHILL BRIGDEN;
KENDRA LYNN BRIGDEN HOLTZMAN;
REBECCA SUSAN BRIGDEN WELCH,

     Plaintiffs - Appellants,

     v.

STATE OF OKLAHOMA, ex rel. The
Oklahoma Department of Corrections;
LARRY FIELDS, individually and in the
capacity as Director of the Oklahoma
Department of Corrections; JACK COWLEY,
individually and in his capacity as Warden of
the Oklahoma Reformatory at Granite;
LT. TERRY NEW, individually and in his
capacity as a correctional officer at the
Granite Reformatory; LT. WAYNE MOREY,
individually and in his capacity as a
correctional officer at the Granite
Reformatory; RON ROSKOM, individually
and in his capacity as Chaplain at the Granite
Reformatory,

     Defendants - Appellees.

No. 96-6339

W.D. Oklahoma

(D.C. No. CIV-95-1626-L)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **ANDERSON**, and **TACHA**, Circuit Judges.

Robert Bruce Brigden, a convicted sex offender, was stabbed to death in his cell at the Oklahoma State Reformatory (OSR) by another inmate on June 12, 1994. Subsequently his widow and personal representative[1] brought this civil rights action against the Oklahoma Department of Corrections and its Director, the Warden of OSR, two correctional officers, and the OSR chaplain. Her suit alleges that the defendants, in violation of Mr. Brigden's Eighth Amendment right to be free from cruel and unusual punishment, were deliberately indifferent to the danger of physical harm to Mr. Brigden at the hands of other inmates and failed to protect him. The district court granted the defendants' motions for summary judgment essentially because the plaintiff had not demonstrated a genuine jury

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]In addition to Mr. Brigden's widow, his children are joined as plaintiffs in this lawsuit. Since Mrs. Brigden is suing in her capacity as personal representative and therefore has standing, for convenience we refer to her individually throughout our opinion as the plaintiff.

question as to whether any defendant had the required culpable mental state with respect to Mr. Brigden's safety.

On appeal the plaintiff contends that the record establishes genuine issues of fact sufficient to avoid summary judgment, and that, in any event, the district court abused its discretion by cutting off discovery.[2] We affirm as to all defendants except Chaplain Roskom. As to him, we reverse and remand for further proceedings.

**BACKGROUND**

In 1992, Mr. Brigden was convicted in Woods County, Oklahoma, of eight counts of lewd molestation and one count of rape by instrumentation and was sentenced to 60 years' imprisonment. On August 25, 1992, he arrived at the Oklahoma State Reformatory to begin serving his sentence. The next morning he was attacked in the prison yard by other inmates apparently because of the nature of his crime, which involved children, and its attendant publicity. He then requested and was placed in protective custody, an area of the prison fenced off from the general population. Prison staff supported Mr. Brigden's placement in protective custody due to the nature of his offense, rating his victim potential as

---

[2]It is unclear whether appellants appeal as to Director Fields, but they make no argument in their brief about the district court's ruling as to him. In any event, it is clear that the district court properly entered summary judgment in his favor.

high.  Appellants' App. at 42.   According to the record submitted to us, Mr. Brigden's incarceration then proceeded without complaint or incident for the next 21 months.

In 1994 the Department of Corrections sought to make various operating and housing efficiencies to accommodate the ever-growing inmate population in the system.  One such change involved closing the protective custody unit at OSR and centralizing protective custody housing at the Oklahoma State Penitentiary (OSP).  Planning in this regard was detailed, as shown by the following excerpts from an April 1, 1994, memorandum from James L. Saffle, Regional Director of the Southeastern Region, to Larry Fields, Director of the Department of Corrections:

> 2.  We believe we can increase medium security beds by moving the protective custody beds from the Oklahoma State Reformatory to the Penitentiary.  According to the daily system count, we would have approximately 27 beds for growth, if our protective custody count remained the same, and they were all housed at the Penitentiary.
>
> We decided to give the inmates at OSR the option to come off protection, prior to any movement of the protective custody unit to the Penitentiary.  There is belief that many of the inmates will choose to remain at OSR.
>
> Our plan is to move the protection unit off of F-4 at the Penitentiary and place all protective custody inmates on D and E Units, which will provide 160 beds, and better protection, due to the isolation from other units, and

individual exercise areas. F-4 would then be used for general housing.

The movement from the F Cellhouse would assist us in better utilizing the current vacant beds that are on the protection unit. We are consistently running 25 beds vacant, which we desperately need to fill.

. . . .

If you approve this strategy, we recommend that our General Counsel review the movement recommendations, in reference to OSR protective custody unit being placed at the Penitentiary, to determine if we need to conduct a classification review prior to movement. We also recommend that we prepare correspondence notification to our legislative leaders, prior to any movement, in order for them to be aware of the location change and reason for the change, concerning our protective custody units.

Lastly, a time schedule of all movement would be prepared by the strategy committee, in order to coordinate all movement, and prevent any communication breakdowns. Of course, this depends on your approval of the recommendations.

I believe these recommendations will enhance correcting our current reception and transfer problem, as well as addressing our bed vacancy problem, within the protective units at OSR and the Penitentiary.

Appellants' App. at 43-44.

The plaintiff acknowledges in her brief on appeal that, as contemplated by the plan outlined above, Mr. Brigden was interviewed by staff and given an option. He could remain in protective custody by transferring to the penitentiary at Lexington, or he could stay at OSR in the general population. Appellants' Br. at 4-5, 12-13, 17. Some inmates chose to transfer to OSP. Appellants' App. at

92. Brigden not only chose, but, according to letters from family members, importuned corrections officials to stay at OSR. Appellants' Br. at 12-13, 17; Appellants' App. at 46, 47.[3]

In conjunction with the dismantling of the protective custody fence at OSR, Warden Cowley announced the planned removal during a scheduled weekly video broadcast to all inmates. The warden told the inmates that the fences were down and that inmates previously housed in protective custody who chose to stay at OSR should be treated with respect. The protective custody unit fence at OSR was removed on May 15, 1994, and Mr. Brigden was housed in the general population. Two weeks later, on May 31, 1992, he complained to staff that he was being intimidated by other inmates. The write-up of the complaint uses the term "bulldogged," without further elaboration. Appellants' App. at 49. Inmates housed in the area testified at the trial of Brigden's killer that the killer and others were going to Brigden's cell almost daily after the fence came down to harass and rob him. Appellants' App. at 81-82. However, none of them testified that they

_____

[3]In their joint motion for summary judgment the defendants recite a number of "facts" unsupported by certified documents, affidavits based upon personal knowledge as required by Fed. R. Civ. P. 56(e), or any reference to a Martinez report requested by the court. Martinez v. Aaron, 570 F.2d 317, 318-19 (10th Cir. 1978). One example is an assertion that thirty-three inmates chose to transfer to protective custody at OSP. Appellants' App. at 23. Appellees then rely on those facts in their brief on appeal without citation to the record in violation of Fed. R. App. P. 28 and 10th Cir. R. 28.1. See, e.g., Appellees' Answer Br. at 3. The plaintiff's brief is equally deficient. We, of course, cannot rely upon unsupported factual assertions, and we strongly deplore their use.

reported the incidents to the defendants, except to the prison chaplain, Ron Roskom.

When Mr. Brigden complained to the staff that he was being "bulldogged," the defendant, Lt. Wayne Morey, offered to move him to A-1-Pod for protection, but Brigden declined in writing, stating: "I Robert Brigden DOC# 207536, does [sic] acknowledge that protection was offered to me and I declined the offer to be moved to A-1-Pod to serve that purpose." Id. at 49. The A-1-Pod was the disciplinary housing unit.

There is evidence that Mr. Brigden either at that time, or generally contemporaneous to the events in question, expressed complaints or concerns to Lt. Morey about being robbed by the inmates who were harassing him, and that Lt. Morey had instructed him to report any such incident. Id. at 88.

In the early evening on June 12, 1994, another inmate, Stephen Edward Wood, entered Mr. Brigden's cell (at OSR cell doors are unlocked during the day) and attempted to rob him of his wristwatch. When Brigden refused to hand over his watch, Wood stabbed him to death, inflicting multiple wounds with a "shank." Id. at 58, 88-89.

The guard on duty in the "A" unit was Terry Duane New, one of the defendants in this case. His shift was 3:00 p.m. to 11:00 p.m. Officer New testified at Wood's trial that at about 6:15 p.m. he noticed Mr. Brigden's cell door

standing open. New did not consider that to be normal, so he walked down and looked in on Brigden, who seemed fine. New then sat by Brigden's door for a little while, but noticed nothing unusual, and Brigden did not say anything. However, New testified he had a strange feeling, so he went up on the roof to observe the activity in the yard. After a while he heard a scream, followed by three more screams. As he started off the roof, he saw a knife thrown out. Id. at 73-75. Mr. Brigden was dead. The knife was connected to Wood, who was ultimately tried and convicted of the murder.

The plaintiff's evidence that the defendants knew Mr. Brigden was in jeopardy and wilfully ignored that fact, includes testimony at Wood's trial from inmates Robert Boulet, Michael Hendricks, John Crosson, James Murphy, and Teddy Graham. Mr. Boulet testified as follows:

> Q Oh, you weren't there when the fences came down?
> A No.
> Q I'm sorry, you did say that.
>   Were you aware, Mr. Boulet, that Reverend Brigden's life was in danger, or did you have any idea?
> A I -- you know, over a period of time people talk, you know, and you hear different things. So I heard that, you know, he shouldn't stay on the yard because something might happen to him.
> Q That was the talk?
> A Right.
> Q I mean, just talk amongst people at the mess hall and so forth?
> A Right.
> Q Okay. Were you aware of a hit list down there?
> A They had it on the -- going around the yard that there was a certain number of people on there, that if they stayed there at Granite

when they moved protective over to McAlester, that they was going to get killed, or whatever, because of their crimes.

Q    That was just kind of the word around?

A    Yeah.

Appellants' App. at 77-78.

Mr. Hendricks testified as follows:

Q    Okay.  Mr. Hendricks, before you heard these conversations that you testified about, before that, were you aware in any way or did you have a sense that Reverend Brigden's life was in danger?

A    Yes.

Q    What gave you that opinion?

A    He's told me quite a bit about it.

Q    Okay.

A    I've tried to talk to him and tried to get him to where he could get himself protection, but it didn't do no good.  So I went to the chapel there at the penitentiary and told the Chaplin, Ron Roscoe [sic], that I felt that this man's life was really in danger --

Q    And this was --

A    -- and could he help in any way, maybe talk to the guy and maybe get him, you know, to change his mind.
Ron Roscoe [sic] says, "I don't want to be involved in it."

Q    And that's the chaplin [sic]?

A    Yeah.

Q    And we are talking about a period of time before this incident?

A    Before the killing, yes.

Id. at 79.  He also testified that he knew Brigden "was getting harassed by the people that killed him," id. at 80, but was unable to state whether any of this information was brought to the "attention of the penitentiary people."  Id.

Mr. Murphy testified that inmate David Chatham told him that Chatham and a couple of others would go to Brigden's cell frequently "and take something

-9-

from him just to be -- having something to do just for the fun of it and laugh about it." Id. at 81. He then testified as follows:

> Mr. Murphy, did you believe back last year that Reverend Brigden's life was in danger from all sorts of inmates; did you believe that?
> Q     Yeah.
> Q     Have you ever heard that there was some kind of a hit list out there in the yard?
> A     Everyone has heard of that.
> Q     Yeah. Did you ever hear who's on it?
> A     Yeah, several people.
> Q     Okay. Do you think the prison officials know about that?
> A     Yeah. They just said it was a joke, just like everyone else thought it was.
> Q     Okay. Well, you probably knew Tim Clark then, didn't you?
> A     Yeah.
>        MR. DEAVER: Your Honor, we would object to the relevance of --
>        THE COURT: Sustained.
> Q     (By Mr. Jones) Did you ever watch the warden's TV show?
> A     Yes.
> Q     Do you remember when he announced that the PC fence was coming down and you all be good to him?
> A     Yeah.
> Q     Did you see that one?
> A     Yeah.
> Q     Did you know Terry New, the corrections officer, very well?
> A     I knew him, I mean, just like I know a lot of them there.
> Q     Do you think Mr. New was aware that Mr. Brigden was in danger?
>        MR. DEAVER: Object, Your Honor, calls for speculation.
>        THE COURT: Sustained.

Appellants' App. at 83-84.

Mr. Crosson testified as follows:

Q      Did you do anything -- you said you were perfectly aware that Reverend Brigden's life was in danger. Did you do anything maybe to tell the prison officials about that?

A      The prison officials already knew it.

Q      They did?

A      Yes, sir. They said we had a choice, we could stay there, or we could go to OSP. OSP is not a choice. You're made to go to OSP.

Q      Bad place, isn't it?

A      Yes, sir.

Q      23-hour a day lockdown?

A      Yes, sir.

Q      Okay. They knew his life was in danger, and they gave him a choice, and he chose to stay at Granite; is that about it?

A      Yes, sir.

Q      Okay. Have you ever heard of a hit list around the yard?

A      Yes, sir.

Q      Do you think it existed?

A      Yes, sir, it does. It still does.

Q      And there would be some names on it about who the various people in the population were they want to hit?

A      Right.

Q      Do you think the prison officials know about that?

A      Yes, sir.

Q      Do you think they ever tried to get a copy of the list?

A      I can't answer that, sir.

Q      Did you ever watch the warden's TV show?

A      Yes, sir.

Q      Did it make you uncomfortable being in A Unit when the show came on that just informed everybody the fences are down, that you be good to those guys; did that make you uncomfortable? Kind of like advertising it.

A      For me it didn't because I was tired of living anyway. That's the reason I stayed, that was my choice.

Q      Oh, okay. But for some it probably worried them?

A      I'm sure.

Id. at 85-87.

-11-

Teddy Graham described how inmate Wood entered Brigden's cell on June 12, 1994, demanding Brigden's watch, and was told by Brigden that "Lieutenant Moory [sic] had given him a direct order to tell anyone who tried to rob him, that he would come to Lieutenant Moory [sic] and give him their name." Appellants' App. at 88.

The plaintiff also introduced the trial testimony of Dr. Philip J. Murphy, to the effect that Stephen Wood was a schizophrenic who committed murders previously in part because he had a rage against child molesters. Id. at 93. Finally, the plaintiff established that after the protective custody fence was removed there was no restriction on inmates in the general population going to the unit where Brigden was housed, and that inmates could go from one cell to the other. Id. at 72.

**DISCUSSION**

**I.**

We review de novo the district court's grant of summary judgment for failing to establish a cognizable Eighth Amendment claim. Applying the same standards used by the district court, we must affirm if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In short, drawing all reasonable inferences in favor of the plaintiff, we must affirm if it would be improper to submit the case to a jury on this record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

"'[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" Farmer v. Brennan, 511 U.S. 825, 833 (1994) (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988)); see Wilson v. Seiter, 501 U.S. 294, 303 (1991). However, every injury inflicted by one inmate on another does not constitute a violation of the Eighth Amendment prohibition of cruel and unusual punishment. Farmer, 511 U.S. at 834.

Farmer, consistent with earlier cases, held that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer, 511 U.S. at 828. The Court stated:

> [A] prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an excessive
> risk to inmate health or safety; the official must both be aware of
> facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the inference.

Id. at 837.

This subjective standard requires a culpable state of mind on the part of the official. See Wilson, 501 U.S. at 301-03. It is not satisfied by negligence (which, by definition, is an unreasonable act or omission), or even gross negligence, or recklessness as defined by civil law.[4] Farmer, 511 U.S. at 835-37 & n.4; Barrie v. Grand County, 119 F.3d 862, 869 (10th Cir. 1997) (citing Berry v. City of Muskogee, 900 F.2d 1489, 1495-96 (10th Cir. 1990)). It requires a level of recklessness tantamount to criminal recklessness, inclusive of a subjective *mens rea*. Farmer, 511 U.S. at 836, 839-40. Furthermore, the deliberate indifference test also requires that in order for a prison official to be liable for a § 1983 violation the official must have been personally and directly responsible for the occurrence of the alleged Eighth Amendment violation. Grimsley v. MacKay, 93 F.3d 676, 679 (10th Cir. 1996); Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996).

Applying these exacting standards, we agree with the district court's careful analysis, with the exception of Chaplain Roskom. Thus, with that one exception, we agree with the district court that the testimony offered by inmates Boulet, Hendricks, Crosson, Murphy and Graham does not implicate any

---

[4]"The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Farmer, 511 U.S. at 836 (citing W. Page Keeton, et al., Prosser & Keeton on the Law of Torts, § 34, at 213-14 (5th ed. 1984) and Restatement (Second) of Torts § 500 (1965)).

defendant. The testimony is general, conclusory, and speculative, and it would be impermissible to allow a jury to speculate on the defendants' level of actual knowledge and their state of mind based on such testimony.

Warden Cowley certainly knew that OSR no longer had a protective custody section and that Mr. Brigden had declined protective custody at OSP.[5] That the warden chose the medium of a prison-wide television announcement to address the subject of fence removal at the previously segregated housing unit at OSR hardly shows a culpable state of mind toward Brigden. Quite the opposite. The fence removal would obviously be common knowledge, especially to inmates who would have free access to the area. The warden's message recognized the obvious and was a cautionary warning to all inmates about their behavior. No facts at all establish that Warden Cowley knew Mr. Brigden was going to be attacked and ignored the situation. The only thing the plaintiff can point to is that Brigden was attacked in 1992 and had been in protective custody because convicted child molesters may be in danger in a general prison population.

_____

[5]We reject at the outset the contention that centralizing protective custody at OSP was punitive or "no choice at all" or in any other way violated the constitutional rights of Mr. Brigden or any other inmate. Inmates have no constitutional right to placement in a particular prison facility. See Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983); Hewitt v. Helms, 459 U.S. 460, 468 (1983) ("[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."); Meachum v. Fano, 427 U.S. 215, 224-25 (1976).

On this point, Brigden's own actions in twice refusing the offer of protective custody become relevant as to the state of mind of all the defendants and as to their culpability. First, while it may be argued that prison officials have superior knowledge about dangers posed by the prison environment, and about particularly dangerous inmates, no one could have had a more intimate interest in assessing threats to Brigden's safety than Brigden himself. One cannot be in a prison for almost two years, even though segregated, without absorbing knowledge of the culture of the place, beginning with the certain knowledge of his 1992 attack by other inmates and why he was placed in protective custody at the outset. If Brigden did not feel sufficiently threatened to choose protective custody at OSP, it is hard to see why prison officials were not entitled to take this into account in their own risk assessment.

Then, after experiencing problems and complaining about them, Brigden once again was offered and refused protective custody—this time in writing.[6] Once again, it is hard to see why Brigden's own view of his safety would not at least be one factor to consider in evaluating whether or not prison officials were

----

[6]As indicated previously, we reject the argument that the offer of protective custody in the disciplinary section at OSR—the only such housing available at OSR after Brigden's refusal of transfer to OSP—was somehow punitive or "no choice." In addition to the authorities cited in supra note 5, see Sandin v. Conner, 515 U.S. 472, 485-87 (1995). The confinement offered was neither for the purposes of punishment, nor, under the circumstances, atypical.

subjectively criminally reckless in perceiving an unreasonable risk to Brigden, in actually drawing the inference, and in failing to act.  See Knight v. Gill, 999 F.2d 1020, 1022 (6th Cir. 1993) (inmate's refusal to be placed in temporary protective custody is a factor to be considered in determining prison official's state of mind).

Looked at another way, a prison official is not deliberately indifferent if he knows of a risk to an inmate and takes reasonable steps to abate the risk.  Farmer, 511 U.S. at 844-45.  Prison officials took reasonable steps to protect Brigden on two occasions, and he turned them down both times.

For all these reasons, there is no jury case against Warden Cowley, nor against Lt. Morey or Officer New.  At most, Officer New was negligent in going up on the roof.  But we decline even that characterization, as well as plaintiff's argument, that Brigden's cell door should have been locked.  Brigden was in the general population, had refused a unit where the doors are locked, and, according to a letter in the prison files, enjoyed going to the library for the first time. Brigden was not entitled to a personal guard as he moved about the prison (where he would be as exposed to assault as when in his cell), or to otherwise generally dictate the terms of his incarceration.  Absent knowledge of any specific threat, Officer New's general uneasiness hardly translates into a culpable indifference toward Brigden's safety.

Our only disagreement with the district court's analysis concerns Chaplain Ron Roskom. The record (which we must accept) shows he was told specifically that Brigden was in serious danger and chose to ignore the warning, saying he did not want to get involved. The district court interpreted the warning to relate only to persuading Brigden to transfer to OSP. We respectfully disagree, at least at this point. Drawing inferences favorable to the nonmoving party, we conclude that on the record as it now stands, there is a genuine issue of fact whether or not Chaplain Roskom was deliberately indifferent to a serious risk to Brigden.

There is much that the record does not tell us, however. For instance, we are unable to ascertain Chaplain Roskom's status as a state actor, or his duty or ability to control or affect circumstances relating to the safety of an inmate. It could be that as the record is further developed on remand, summary judgment may again be appropriate for consideration. But, as the record now stands, we must reverse the summary judgment entered in favor of Roskom.

## II.

The district court cut off discovery in this case simultaneously with its grant of summary judgment in defendants' favor. The plaintiff argues persuasively that in doing so the district court abused its discretion. Plaintiff contends that the district court erroneously stated that plaintiff filed no Fed. R.

Civ. P. 56(f) affidavit seeking further discovery in response to the defendants'

motion for summary judgment. Appellants' App. at 125. In fact, plaintiff did file

a 56(f) affidavit, albeit in response to defendants' motion for protective order.

Appellants' App. at 54-55. Plaintiff also contends that government counsel first

resisted, then were slow in responding to, timely discovery requests, then falsely

represented to the court that plaintiff's motion to compel was moot because

everything requested had been provided. Plaintiff promptly filed a pleading

objecting to the mootness contention, but the district court granted judgment

without ever mentioning or ruling on the objection.

Frankly, we are sympathetic to the plaintiff's general theme that discovery

proceedings here were less than ideal. But the standard governing our review of

the court's denial of further discovery is abuse of discretion. Burks v. Oklahoma

Publ'g Co., 81 F.3d 975, 981 (10th Cir.), cert. denied, 117 S. Ct. 302 (1996);

Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir. 1995), cert. denied,

116 S. Ct. 1678 (1996). And, our search of this entire record leaves us convinced

that there is insufficient showing of the existence of discoverable evidence to

establish error on the part of the district court. Clearly, the plaintiff hopes and

believes that further discovery will turn something up.  It takes some showing

greater than that, however, to prevail at this point.[7]


**CONCLUSION**

For the reasons stated, the judgment of the district court is AFFIRMED,

except as to the defendant RON ROSKOM.  That judgment is REVERSED and

the case is REMANDED for further proceedings.

ENTERED FOR THE COURT

Stephen H. Anderson<br>Circuit Judge

---

[7]For instance, in the 56(f) affidavit attached to the Plaintiffs' Response to Motion for Protective Order, counsel referred to letters and other information, but is general and conclusory as to the information alleged therein, and nothing is attached to the affidavit. Also, in denying that they had sufficient access to materials admittedly shown them by the government, counsel acknowledge at least some access, yet identify nothing on appeal, or in a motion to the district court to reconsider its ruling, which would materially change the posture of the case.