**David Earl SINNETT, Plaintiff,**

v.

**Charles SIMMONS, et al., Defendants.**

**Civil Action No. 97–3121–KHV.**

United States District Court,
D. Kansas.

March 31, 1999.

David Earl Sinnett, Norton, KS, pro se.

Hsing Kan Chiang, Office of Attorney General, Kansas Judicial Center, Topeka, KS, for Charles Simmons, William Cummings, David R. McKune, Harold Nye, Carla Schermbeck, Marcelle McGowern, Roger D. Vinzant, Allan Smith, William W. Hayes, Cindy Nelson, Rusty Coker, R.A. Reno, Tina M. Schmidt, Jeff Byrum.

John D. Tongier, Holbrook, Heaven & Osborn, P.A., Merriam, KS, for Sherril Robinson, Valerie Harrington, Ed Miles.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff brings this pro se civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated the First, Fifth, Seventh, Eighth, Ninth and Fourteenth Amendments by interfering with his freedom of religion, violating his due process and equal protection rights and failing to provide adequate protection. This matter comes before the Court on the *Motion for Summary Judgment* (Doc. # 59) filed July 6, 1998 by Charles Simmons, William Cummings, David McKune, Harold Nye, Carla Schermbeck, Marcelle McGowan, Roger Vinzant, Allan Smith, William Hayes Cindy (Nelson) Meadows, Rusty Coker, R.A. Reno, Tina Schmidt and Jeff Byrum, and the *Motion To Dismiss* (Doc. # 57) filed June 16, 1998 by Valerie Harrington, Edward Miles, and Sherril Robinson.[1] For the reasons stated below, the Court finds that said motions should be sustained.

### *Summary Judgment Standard*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material"

---

1. Defendants title their motion as a motion to dismiss, but seek relief under both Fed. R.Civ.P. 12 and 56. Defendants also rely on the *Martinez* report in this case. Plaintiff provides evidence outside of the pleadings and the Court therefore construes the motion to dismiss as one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b).

only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505. The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

In pro se prisoner litigation, the Tenth Circuit endorses the completion and filing of a "Martinez report" where the prison constructs an administrative record detailing the factual investigation of the events at issue. *See Martinez v. Aaron,* 570 F.2d 317, 319 (10th Cir.1978). The Martinez report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir. 1997) (citing *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991)). The pro se prisoner's complaint, when sworn and made under a penalty of perjury, is also treated as an affidavit and, like the Martinez report, serves as evidence for a summary judgment determination. *See id.*

### Facts

The following facts are undisputed, or where disputed, construed in the light most favorable to plaintiff. Immaterial facts and factual allegations not properly supported by the record are omitted.

On February 14, 1996, an unknown inmate or inmates attacked plaintiff at Ellsworth Correctional Facility ("ECF"), apparently because plaintiff had provided information to the authorities and thus had been labeled a "snitch." Before the attack, plaintiff was "centrally monitored" from eleven other inmates. That is, prison authorities screened plaintiff from the inmates on whom he had snitched. After the attack, the Department of Corrections ("DOC") found that plaintiff needed to be in protective custody, apart from the general population. Therefore, on February 29, 1996, defendants transferred plaintiff to the protective custody unit at Lansing Correctional Facility ("LCF"). At the time of the transfer, defendants did not know that any inmate in the LCF protective custody unit would pose a threat to plaintiff's safety.

On August 14, 1996, prison officials placed inmate David Leaverton in the protective custody unit at LCF. According to prison records, Leaverton had exhibited

violent tendencies but had not displayed hostility toward plaintiff prior to this time.

On August 6, 1996 plaintiff was denied parole. A month later, on September 8, 1996, he wrote to Charles E. Simmons, Secretary of Corrections, requesting an equitable resolution of his incarceration because he was no longer (and never had been) the corporal manifestation of the person represented in his criminal records. On September 11, 1996, William L. Cummings, Corrections Manager, Risk Management, responded to plaintiff's grievance by directing plaintiff to the Kansas Parole Board for all issues concerning parole.

On September 30, 1996, in response to inmate disturbances, LCF went on lock down status to maintain order and security. Because LCF had to transfer inmates from lower security facilities to higher security facilities, prison officials on October 10, 1996 temporarily transferred inmates in the protective custody unit—including plaintiff and Leaverton—to the Larned Correctional Mental Health Facility ("LCMHF"). The inmates remained at LCMHF untile November 18, 1996, when the DOC returned them to LCF.

Meanwhile, from October 10 to October 29, 1996, prison officials at LCMHF restricted the privileges of the transferred inmates by denying them smoking privileges, extended exercise time, visits to the library, and participation in programs to contain inmate disturbances throughout the DOC system. On October 16, 1996, LCMHF placed Leaverton in administrative segregation for two or three days so that officials could investigate his allegation that inmates in the protective custody unit were planning to riot and take hostages. After the investigation was completed, LCMHF returned Leaverton to the protective custody unit.

On October 16, 1996, plaintiff submitted a Form 9 request to Chaplain Services at LCMHF, stating that he was beginning a religious fast in accordance with Isaiah 58:6 to effectuate God's promise to him. One reason for the fast was to secure a just and equitable resolution of plaintiff's sentence on the grounds stated in the grievance letter of September 8, 1996. Through fasting and prayer, plaintiff hoped to release the evil spirits which possessed defendants and make them recognize that he was no longer a lawfully convicted inmate. On October 18, 1996, Chaplain Services spoke with plaintiff about the matter and plaintiff agreed to eat one slice of bread every three days. Daily segregation reports show that plaintiff refused meals from October 16 through October 29, 1996. During this time, he consumed peppermint candy to alleviate his smoking cravings and ate crackers on various occasions. Lt. William Hayes, Internal Investigations, also provided cookies to plaintiff. During the fast, several defendants counseled plaintiff on the damaging effects of starvation. LCMHF officials also notified defendant Valerie Harrington, Mental Health, that plaintiff had missed three consecutive meals. Pursuant to IMPP 12–119,[2] she counseled plaintiff on the effects of starvation. Prison officials also monitored plaintiff's health in the prison clinic. The Segregation Review Board, consisting of Roger Vinzant, Security, R.A. Reno, Classification Chairman, and Ed Miles, Mental Health, told plaintiff that they would place him in administrative custody away from food available in the protective custody unit. Unnamed officers also temporarily confiscated his coffee from his cell. No prison official ever forced plaintiff to eat any food.

On October 25, 1996, inmate Frank Woods told Ed Miles, Mental Health, that he observed Leaverton "exhibit hostility" toward plaintiff and that the administration "should be concerned about [Leaverton's] behaviors." (Affidavit of Frank Woods, contained in Doc. # 39.) Three days later, on October 28, 1996, at approximately 5:30 p.m., Leaverton attacked

---

**2.** Internal Management Policy and Procedure ("IMPP") 12–119 describes procedures for handling inmates who refuse to eat or claim that they are on hunger strikes. IMPP 12–119 does not include religious fasts in its definition of hunger strikes.

plaintiff with a clothes hook in the day-room of the protective custody unit at LCMHF. Tina Schmidt, a correctional officer, witnessed the attack. Leaverton struck plaintiff multiple times in the back of his head and back, causing his scalp to bleed. Officer Schmidt called for urgent assistance and ordered Leaverton to separate from plaintiff without physical intervention. Leaverton released plaintiff and surrendered the clothes hook to Officer Schmidt. Jeff Byrum, another correctional officer, arrived at the scene and assisted Officer Schmidt in restraining Leaverton and plaintiff. Leaverton was then removed to segregation and plaintiff was taken to the medical clinic.

At approximately 5:34 p.m., Sharon Henderson, a nurse, treated plaintiff at the clinic. She reported that plaintiff had received a small laceration on his scalp (one to 1.5 centimeters) and also a contusion the size of a quarter. She also reported that his neurological assessment was normal. Plaintiff disagrees with her assessment, claiming that he was hit and stabbed ten to fourteen times and received multiple lacerations and contusions.

On October 28, 1996, Hayes interviewed Woods about the attack on plaintiff. In the course of the interview he acknowledged that Miles had previously advised him about the matter. *Id.*

Plaintiff ended his fast on October 29, 1996. Plaintiff states that he was forced to give up his religious rights after being threatened by clinic staff and officers at LCMHF. Specifically, plaintiff says that Harrington and Hayes threatened to restrain him in the medical clinic or in administrative segregation unless he ended his fast.

Plaintiff names the following defendants in his pleadings in addition to the officials named above: David McKune, Warden, LCF; Harold Nye, Warden, LCMHF; Carla Schermbeck, C–1 Cellhouse, Unit Team Manager; Marcelle McGowan, Internal Investigations, LCF; Sherril Robinson, Mental Health Advisor, LCF; Allan Smith, Unit Team, LCMHF; Cindy (Nel-son) Meadows, Director of Classification, LCMHF; and Rusty Coker, Security, LCMHF. The following defendants played supervisory roles in the DOC: Simmons, Cummings, McKune, Nye, Schermbeck, (Nelson) Meadows, Coker and Reno.

### Analysis

#### A. Free Exercise of Religion—Interference With Fasting

In support of his First Amendment arguments, plaintiff mentions the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.A. § 2000bb et seq. Before 1997, the Tenth Circuit Court of Appeals relied on RFRA in holding that a prison system may not substantially burden a prisoner's right of free exercise, absent a compelling state interest, and must employ the least restrictive means necessary to further that interest. *Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.), *cert. denied,* 515 U.S. 1166, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995). In 1997, in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the United States Supreme Court declared that RFRA is unconstitutional. *Boerne* effectively overruled *Werner,* and this Court therefore relies on pre-RFRA precedent.

Plaintiff claims that defendants violated his religious rights by interfering with his fast. To determine if defendants impermissibly infringed on plaintiff's religious freedoms under the First Amendment, plaintiff must first show that he is sincere in his religious beliefs. *La Fevers v. Saffle,* 936 F.2d 1117, 1119 (10th Cir. 1991) (citing *Frazee v. Illinois Dept. of Employment Sec.,* 489 U.S. 829, 832–33, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989)). Beliefs and practices that differ from the "norm" are common among various religions and First Amendment guarantees go beyond the practices of the majority of a religious sect. *Id.* (citing *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)).

■ Defendants assert that the primary reason for plaintiff's fast was to draw attention to the fact that Simmons had denied plaintiff's request for parole, and that plaintiff's fast had all the appearances of a politically motivated hunger strike. Plaintiff alleges that his fast was religious in nature and that it was in accordance with the "dictates and beliefs of his religion." The Free Exercise Clause protects only beliefs rooted in religion. *Wisconsin v. Yoder,* 406 U.S. 205, 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Religious beliefs need not be "acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas,* 450 U.S. at 714, 101 S.Ct. 1425. Because the Court must construe all facts in favor of plaintiff, it finds that plaintiff has raised a genuine issue of material fact whether the fast was based on a sincerely held religious belief. Defendants are not entitled to summary judgment on this issue.

■ Assuming that plaintiff's fast was religious in nature, the Court must determine if defendants' actions were insufficient to violate plaintiff's free exercise right as a matter of law. The Tenth Circuit has noted that a prisoner's right to free exercise is not absolute; rather, the First Amendment requires that he be accorded "a reasonable opportunity to pursue his religion." *Hall v. Maynard,* 989 F.2d 507 (10th Cir.1993) (Table, text available on Westlaw at 1993 WL 76276, *3). To be constitutionally proper, DOC policies which affect inmates' free exercise rights must be reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The Tenth Circuit has identified the legal standard which governs our inquiry, as follows:

> An infringement of a constitutional right is valid in prison if it is "reasonably related to legitimate penological objectives." The four factors to consider in

making the reasonableness inquiry are 1) whether a valid, rational connection exists between the prison policy and the legitimate governmental interest advanced as justification; 2) whether alternative means of exercising the constitutional right remain open to prisoners; 3) what impact accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and 4) whether alternatives exist that would accommodate the prisoner's rights at little cost to valid prison interests.

*Id.* (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)); *see also Mosier v. Maynard,* 937 F.2d 1521, n. 2 (10th Cir.1991).

Plaintiff alleges that he was forced to give up his religious rights on October 29, 1996, because Harrington and Hayes threatened to keep him in the medical clinic or in administrative segregation unless he ended his fast.[3] Daily segregation reports show that plaintiff refused meals from October 16 to October 29, 1996. Plaintiff does not allege, however, that any defendant forced plaintiff to eat during his fast. According to Harrington's affidavit, she learned plaintiff had missed three consecutive meals and she counseled plaintiff on the effects of starvation, pursuant to IMPP 12–119. While at the clinic on October 28, 1996, plaintiff accepted cookies from Hayes.

■ Plaintiff claims that IMPP 12–119 did not require Harrington to counsel him and that her counseling violated his free exercise rights. IMPP 12–119 states in the definition section that hunger strikes do not include religious fasts. Thus, if plaintiff's fast was religious in nature, Harrington had no obligation to counsel plaintiff on the effects of starvation. Even so, Harrington's counseling did not interfere with plaintiff's fast. Plaintiff's allegations do not demonstrate more than a de minimis interference with his right to fast. This

**3.** Plaintiff cites no admissible evidence that defendants other than Harrington and Hayes threatened to place him in isolation or otherwise restrain him. As to the remaining defendants, summary judgment on this claim is appropriate.

de minimis imposition is not of constitutional significance. *See Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

■ In addition, defendants' threats to place plaintiff in the medical clinic or in administrative segregation during his fast did not unreasonably interfere with his right to exercise his religion. Plaintiff does not allege that he would be unable to fast in either location. Plaintiff was free to exercise his religious right to fast in any area of the prison. Thus, even if defendants had followed through on their threats, plaintiff has failed show that their actions would have unreasonably infringed on his right to free exercise of religion. As such, Harrington and Hayes are entitled to summary judgment on this issue.

## B. Fourteenth Amendment

■ Plaintiff appears to assert that Simmons, Cummings, David McKune (Warden, LCF) and Harold Nye (Warden, LCMHF) violated his Fourteenth Amendment due process and equal protection rights by transferring the protective custody unit from LCF to LCMHF. Inmates, however, have no constitutional right to be imprisoned in any particular facility. *See Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Frazier v. Dubois,* 922 F.2d 560, 561 (10th Cir. 1990). "Because the Due Process Clause itself does not create a liberty interest in the context of a transfer, [the Court] must determine whether state law creates such an interest." *Jordan v. Bowles,* No. 96–2169, 1997 WL 589174, at *2 (10th Cir. Sept.24, 1997). Even if state law grants rights, it does not create a liberty interest unless restraint of that right results in a hardship that is both "atypical" and "sig-

nificant" when compared to ordinary prison life. *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

■ The Court finds that plaintiff did not have a protected liberty interest here. Plaintiff has failed to identify any state law that creates an interest in the context of a prison-to-prison transfer. Plaintiff also fails to show that the transfer resulted in an "atypical" or "significant" hardship. Plaintiff claims that at LCMHF, he and other transferred inmates were denied smoking privileges, extended exercise time, visits to the library, and participation in certain programs. Prison officials assert that the restrictions were necessary to contain disturbances throughout the DOC system. Plaintiff admits these restrictions were lifted by the end of October.

"Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiff's allegations, even when construed most favorably to him, do not show any restrictions that are more harmful than a transfer to administrative or disciplinary segregation. It is well established that these transfers are not atypical or significant hardships. *See Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. Plaintiff therefore does not have a protectable liberty interest here. Accordingly, Simmons, Cummings, McKune and Nye are entitled to summary judgment on plaintiff's Fourteenth Amendment unconstitutional transfer claim.

## C. Eighth Amendment[4]

■ Under the Eighth Amendment, prisoners have a constitutional right

---

4. Plaintiff also alleges that defendants' conduct violated his rights under the Fifth and Fourteenth Amendments, but his claim essentially alleges cruel and unusual punishment. The Fifth and Fourteenth Amendments prohibit punishment prior to an adjudication of guilt in accordance with due process of law.

*Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Fifth Amendment protects against deprivations of life, liberty or property by the federal government, which plaintiff does not allege in this case. *See Berry v. City of Muskogee,* 900 F.2d 1489, 1492 n. 2 (10th Cir.1990). Moreover,

to reasonable protection from attacks by other inmates. *Berry v. City of Muskogee,* 900 F.2d 1489, 1498 (10th Cir.1990); *Blankenship v. Meachum,* 840 F.2d 741, 742 (10th Cir.1988). A failure to protect claim must be evaluated under the deliberate indifference standard of *Estelle v. Gamble,* 429 U.S. 97, 103–07, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), as reiterated in *Farmer v. Brennan,* 511 U.S. 825, 826–28, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Under the deliberate indifference standard, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *MacKay v. Farnsworth,* 48 F.3d 491, 493 (10th Cir.1995) (quoting *Farmer,* 511 U.S. at 847, 114 S.Ct. 1970). Prison officials may still be free from liability in situations where the harm ultimately occurs if the officials responded reasonably to the risk of that harm. *Farmer,* 511 U.S. at 844–45, 114 S.Ct. 1970.

■ Plaintiff argues that Cummings, McKune, Nye, Harrington, Hayes, Schermbeck, McGowan, Robinson, Vinzandt, Smith, (Nelson) Meadows, Coker, Miles and Reno knew some or all of the following: (1) that Leaverton was dangerous and that placing him in protective custody posed a danger to plaintiff; (2) that plaintiff continuously cooperated with officials; (3) that defendants failed to provide additional protection to plaintiff to prevent harm from Leaverton; and (4) that releasing Leaverton from administrative segregation at LCMHF posed a danger to plaintiff. Nothing in the evidence, however, supports these conclusory allegations. Plaintiff's evidence shows merely that defendants knew that Leaverton had a violent history. Plaintiff does not allege that the above defendants knew that placing Leaverton in protective custody created a substantial risk of harm to plaintiff.[5] Nor would the record support such a claim. With respect to these claims, the above named defendants either played supervisory roles within the DOC or had no responsibility in making decisions affecting plaintiff. "Liability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference, rather than mere negligence." *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir.1997). Deliberate indifference requires that the supervisor know that he is creating a substantial risk of serious harm. *Id.* Because plaintiff has failed to show that the above named defendants possessed the requisite knowledge that Leaverton would harm plaintiff it they released him from administrative segregation at LCMHF, plaintiff has failed to show a breach of Eighth Amendment duty based on failure to protect.

Plaintiff also alleges that correctional officers Schmidt and Byrum failed to physically intervene during the attack, thereby causing further injury to him. Plaintiff states that Schmidt watched as Leaverton began beating plaintiff with a clothes hook. Schmidt failed to physically intervene to stop the attack and called for urgent assistance and ordered Leaverton to separate from plaintiff. Plaintiff admits that Schmidt was successful in stopping the Leaverton's attack by her verbal com-

---

where government conduct is constrained by an explicit textual source of constitutional protection—such as the Eighth Amendment's prohibition against cruel and unusual punishment—"that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 1494 (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). While cases involving the safety and bodily integrity of convicted prisoners implicate both the Eighth and the Fourteenth Amendment, the Eighth Amendment provides the primary source of protection, and the standards under the amendments are identical. *Berry,* 900 F.2d at 1494 n. 6. The Court therefore applies Eighth Amendment standards in evaluating plaintiff's claims.

**5.** Plaintiff alleges that before the attack, Vinzant's security team members told him that Leaverton would attack plaintiff. Plaintiff provides no admissible evidence, however, to support this allegation.

mand. The evidence presented by plaintiff also shows that Byrum assisted Schmidt upon his arrival at the dayroom in response to Schmidt's alarm.

The facts of this case are similar to that in *MacKay*. There, during a fight between two inmates, the officer called for assistance to break up the fight but did not immediately intervene physically. *MacKay*, 48 F.3d at 492. In *MacKay*, the court held that summary judgment was appropriate because the prison officials did not act with deliberate indifference. *Id.* at 493. Likewise in the present case, the Court finds that no reasonable jury would conclude that Schmidt and Byrum acted with deliberate indifference in responding to Leaverton's attack on plaintiff.

Plaintiff next claims that Hayes, Coker, Miles, Schmidt and Byrum knew of Leaverton's intent to attack plaintiff at least two days before the attack. Plaintiff has not produced any evidence, however, that Coker, Schmidt or Byrum knew of any such plan. At most the record suggests that on October 25, 1996 (three days before the attack), Hayes and Miles had notice that Leaverton "exhibit[ed] hostility" toward plaintiff and that the administration should "be concerned" about his behaviors, yet they took no measures to prevent the attack. This knowledge, however, does not raise a factual question whether they were deliberately indifferent by failing to take reasonable measures to abate the attack.

"For a prison official to be found liable of deliberate indifference under the Eighth Amendment, the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference.'" *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 809 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970.

The deliberate indifference standard also requires plaintiff to establish that the defendant officials acted with a culpable state of mind and that the defendants' conduct was akin to criminal recklessness and not mere negligence. *Farmer*, 511 U.S. at 836, 839–40, 114 S.Ct. 1970. In *Brigden v. State ex rel. Oklahoma Dept. of Corrections*, 129 F.3d 130 (10th Cir. 1997) (Table, text available on Westlaw at 1997 WL 687674 *2, *7), an inmate told a prison chaplain that a fellow inmate was in serious danger of attack by another inmate, and the chaplain chose to ignore the warning because he did not want to get involved. The court held summary judgment inappropriate because the record revealed a genuine issue of fact whether the chaplain was deliberately indifferent to the inmate's risk of harm. *Id.* The record fails to show that Miles and Hayes deliberately ignored Wood's warning, thereby disregarding an excessive risk of harm to plaintiff. It may be argued that prison officials have superior knowledge about dangers posed by the prison environment, and about particularly dangerous inmates. Plaintiff was the subject of the display of hostility by Leaverton, however, and he had an even more intimate perspective in assessing threats to his safety. Still, plaintiff never reported any concerns to prison officials. On this record, Woods' single comment that he had observed Leaverton "exhibit hostility" toward plaintiff and that the administration "should be concerned" does not raise a genuine issue of material fact whether plaintiff was subject to a substantial risk of harm. Further, nothing in the record suggests that Hayes and Miles drew any inference that Leaverton posed a substantial risk of harm to plaintiff. Because plaintiff fails to show that Miles and Hayes knew of a substan-

tial risk of harm to plaintiff, they are entitled to summary judgment.

In summary, on plaintiff's Eighth Amendment claim, Simmons, Cummings, McKune, Nye, Schermbeck, McGowan, Robinson, Vinzant, Harrington, Smith, (Nelson) Meadows, Coker, Reno, Schmidt, Byrum, Hayes and Miles are entitled to summary judgment.

### D. Immunity

Defendants assert that they are protected by Eleventh Amendment immunity and qualified immunity. These issues are now moot.

### E. Fifth, Seventh and Ninth Amendments

The Fifth Amendment protects against deprivations of life, liberty or property by the federal government. *See Berry,* 900 F.2d at 1492 n. 2. The Seventh Amendment preserves a party's right to a jury trial. *See* U.S. Const. amend. VII. The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend IX. Plaintiff fails to allege how defendants violated his rights under the Fifth, Seventh and Ninth Amendments. Plaintiff therefore fails to state valid claims regarding these rights. Defendants are therefore entitled to summary judgment on these claims.

In his *Memorandum In Opposition To Defendants' Motion(s) For Summary Judgment* (Doc. # 68), plaintiff asks to add two defendants to his complaint and argues that he should be released from prison based upon his religious beliefs. Construing that memorandum as a motion for leave to amend, the Court finds that it should be denied for failure to comply with D.Kan.Rule 15.1. The Court therefore denies plaintiff's request for leave to amend and does not consider this claim.

**IT IS THEREFORE ORDERED** that the *Motion for Summary Judgment* (Doc. # 59) filed July 6, 1998 by Charles Simmons, William Cummings, David McKune, Harold Nye, Carla Schermbeck, Marcelle McGowan, Roger Vinzant, Allan Smith, William Hayes, Cindy (Nelson) Meadows, Rusty Coker, R.A. Reno, Tina Schmidt, and Jeff Byrum be and hereby is SUSTAINED as to all defendants on all claims.

**IT IS HEREBY FURTHER ORDERED** that the *Motion To Dismiss* (Doc. # 57) filed June 16, 1998 by Valerie Harrington, Edward Miles and Sherril Robinson be converted to a motion for summary judgment and that it be and hereby is SUSTAINED.

**IT IS HEREBY FURTHER ORDERED** that plaintiff's request to amend his pleadings to include Chaplain Thomas Phelan and Corrections Officer Patterson be and hereby is OVERRULED.